CROWN LIFE INSURANCE COMPANY, Plaintiff-Respondent,

v.

Jack L. LABONTE, Defendant and Third-Party Plaintiff-Appellant,

Lawrence J. ESSER and George T. Esser, Individually and d/b/a Eagle Investment Company, Third-Party Defendants-Respondents.

Supreme Court

*No. 81–1955. Argued February 3, 1983.—Decided March 1, 1983.*

(Also reported in 330 N.W.2d 201.)

For defendant and third-party plaintiff-appellant there were briefs by *William A. Nohr, David H. Hutchinson, Grace M. Masson* and *Walsh & Nohr,* Milwaukee, and oral argument by *William A. Nohr.*

For plaintiff-respondent there was a brief by *David A. Jarvis, Joseph D. Masterson* and *Quarles & Brady,* Milwaukee, and oral argument by *Mr. Jarvis.*

For third-party defendants-respondents there was a brief by *John T. Clark* and *Miller & Niebler, S.C.,* Milwaukee, and oral argument by *Joseph C. Niebler.*

BEILFUSS, C.J.    This is an appeal from a judgment entered in favor of the plaintiff in an action to enforce a guaranty.

The action was commenced by the Crown Life Insurance Company (Crown) against Jack LaBonte demanding $45,000 pursuant to a contractual guaranty. The guaranty was executed as part of a $180,000 loan made by Crown to Diversified Holdings, Inc. (Diversified). The promissory note executed on June 15, 1971, was originally between Diversified and Richter-Schroeder

Company, Inc., Crown's loan correspondent, and was secured by a mortgage on an apartment building. Richter-Schroeder lent the $180,000 to Diversified to provide the construction financing for a 20-unit apartment building to be constructed in Milwaukee. After the construction was completed the note and mortgage were assigned to Crown. As contemplated in the original transaction, Crown provided the permanent financing.

LaBonte was an officer, director and 50 percent shareholder of Diversified. As a part of the entire transaction he executed a guaranty of the note and mortgage.[1] The guaranty guaranteed payment of the entire debt until the note and mortgage had been assigned to Crown. Following this assignment the guaranty guaranteed payment of the first $45,000 of the mortgage debt. The guaranty provided in pertinent part:

"2. Unconditionally and absolutely, jointly and severally, guarantee the due and punctual payment of the first $45,000.00 principal of the Note to be paid after the assignment of the Note and Mortgage from Mortgagee to Crown Life Insurance Company, the interest thereon and any other moneys due or which may become due thereon, and the due and punctual performance and observance by the Debtor of all the other terms, covenants and conditions of the Note and Mortgage . . .

"3. . . . it being the intention hereof that the Guarantors shall remain liable as principal as to and until the Note and Mortgage have been assigned to Crown Life Insurance Company and the first $45,000.00 of the principal of the Note and Mortgage to be paid, with interest thereon, and any other sums due or to become due thereon, shall have been fully performed and observed by the Debtor, notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of the Guarantors.

" . . .

"5. Agree that this Guaranty may be enforced by the Mortgagee without first resorting to or exhausting any

---

[1] The guaranty was also executed by William Podell who is now deceased and whose estate is insolvent.

other security or collateral or without first having recourse to the Note or any of the property covered by the Mortgage through foreclosure proceedings or otherwise; provided, however, that nothing herein contained shall prevent the Mortgagee from suing on the Note or foreclosing the Mortgage or from exercising any other rights thereunder and if such foreclosure or other remedy is availed of only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature whatsoever, shall be applied in reduction of the amount due on the Note and Mortgage and the Mortgagee shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of payment hereunder or enforcement hereof. . . .

" . . .

"9. Make this Guaranty on condition that the liability of the Guarantors hereunder shall terminate at such time as the unpaid principal balance of the Note shall have been reduced to $135,000.00 or less following the purchase of the Note by Crown Life Insurance Company."

Shortly after the assignment of the loan documents and the guaranty to Crown, Diversified conveyed the property for $255,000 to Eagle Investment Company (Eagle), a partnership in which Lawrence and George Esser were partners (Essers). Eagle subsequently sold the property and since then the property has been subject to numerous conveyances. The property was a "troubled development" and as early as 1973 Crown had difficulty collecting on the note and mortgage. There is further evidence that the property was subject to bad management, including mismanagement following the appointment of several receivers pursuant to a 1976 foreclosure action instituted by University National Bank which held a third mortgage on the property.[2]

Between May of 1976 and April of 1977, Crown received only two payments on its mortgage and instituted

[2] Crown intervened in this foreclosure action and sought to commence its own foreclosure. The court allowed the intervention but would not allow Crown to foreclose on its mortgage in this action.

its own foreclosure action on April 22, 1977, but did not join either Diversified or LaBonte. Crown obtained a judgment in the amount of $228,000, which included approximately $173,000 in principal.[3] At the subsequent sheriff's sale, the property was sold to Crown, the only bidder, for $182,000. LaBonte received notice of the confirmation hearing but did not attempt to challenge the sale. The sale was subsequently confirmed by the trial court.

The difference between the sale price and Crown's judgment was approximately $47,000. Crown commenced this action in October of 1978 to collect $45,000 of this deficiency from LaBonte based on the guaranty. La Bonte filed a third-party claim against the Essers and Eagle seeking indemnification in the event that LaBonte was held liable to Crown on the guaranty. A trial was held to the court. At the close of Crown's case the trial court granted LaBonte's and the Essers' motion to dismiss in an oral decision from the bench. The court reasoned that LaBonte's liability under the guaranty was extinguished because the application of the proceeds of the sheriff's sale reduced the principal below $135,000. However, the trial court vacated the order upon a motion for reconsideration, holding that under the unambiguous language of the contract "the creditor may apply the proceeds from the sale of the collateral to the unguaranteed portion of the debt even where the partial guaranty is limited to the first portion of the debt."

The trial court granted judgment in favor of Crown and dismissed the third-party complaint. In determining the amount of the award the court found that $190,000 was the fair value of the collateral, and that $213,796.20 was owed to Crown as of the date of the sheriff's sale. It therefore applied $190,000 against the debt and award-

---

[3] Only approximately $7,000 of the principal had been paid to this point.

ed $23,796.20 on the guaranty, $20,000 in attorneys' fees and $1,478.67 in disbursements. LaBonte appealed and we accepted the appeal on certification from the court of appeals.

The first issue on appeal is whether the proceeds of the foreclosure sale can be applied as payments to the mortgage debt under the terms of the guaranty to extinguish LaBonte's liability under the guaranty. We hold that the unambiguous language of the guaranty, in light of the circumstances surroundings its execution, demonstrate that the parties intended that proceeds obtained from the foreclosure and forced sale of the collateral should be applied first to the unguaranteed portion of the loan. Therefore, LaBonte's liability under the guaranty was not discharged by the application of the proceeds to the mortgage debt.

LaBonte contends that under the terms of the guaranty his liability was discharged because the application of the sale proceeds to the mortgage debt constituted payment of the first $45,000 principal and reduced the outstanding balance of the note and mortgage below $135,-000. Crown replied that the guaranty unambiguously provides that proceeds received from a forced sale are not payment under the terms of the guaranty and therefore do not extinguish the guaranty unless they are sufficient to pay the entire mortgage debt.

A guarantor's liability depends upon the particular terms of his or her engagement. *Continental Bank & Trust Co. v. Akwa,* 58 Wis. 2d 376, 388, 206 N.W.2d 174 (1973). "In construing contracts of guaranty as in construing other contracts, the important question is: What did the parties intend?" *Sentinel Co. v. Smith,* 143 Wis. 377, 379, 127 N.W. 943 (1910). The construction of a written contract is normally a question of law which may be reviewed independently on appeal. *Jones v. Jenkins,* 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979). The deter-

mination of whether the application of the proceeds of the sale of the collateral to the mortgage debt extinguished LaBonte's liability under the guaranty depends on the intent of the parties in executing the contract.

The trial court, construing the terms of the contract, held that it unambiguously allowed the creditor to apply the proceeds to the unguaranteed portion of the debt where the guaranty is limited to the first portion of the debt. An examination of the language of the contract in light of the circumstances of its execution, and the case law in other jurisdictions lead us to the conclusion that the trial court correctly construed the intent of the parties under the contract.

We first examine the language of the guaranty as the best indicator of the parties' intent. *In Matter of Estate of Alexander,* 75 Wis. 2d 168, 181, 248 N.W.2d 475 (1977). Paragraph 2 of the guaranty provides that the guarantor promised the "due and punctual payment" of the first $45,000 of the mortgage debt following the assignment to Crown. This unambiguous language required prompt, timely and voluntary payment of the first $45,000. The application of the proceeds from the forced sale of the collateral securing the guaranteed debt was clearly not the "due and punctual payment" required by the terms of the guaranty in order to discharge La Bonte's liability thereunder.

Paragraph 3 of the guaranty provides in part:

". . . it being the intention hereof that the Guarantors shall remain liable as principal as to and until the Note and Mortgage have been assigned to Crown Life Insurance Company and the first $45,000.00 of the principal of the Note and Mortgage to be paid, with interest thereon, and any other sums due or to become due thereon, *shall have been fully performed and observed by the Debtor,* notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of the Guarantors." (Emphasis supplied.)

This provision clearly states that the intention of the parties was that LaBonte "remain liable" under the guaranty until performance "by the debtor" of the payment of the first $45,000 of the debt. Again, payment out of the proceeds of the collateral is not performance "by the debtor." These two provisions clearly contemplate voluntary payment of the first $45,000 of the mortgage debt in order to discharge the guarantor's liability rather than payment through a forced sale.

Other language in the contract guaranty indicates that LaBonte's liability under the guaranty was independent of and in addition to the collateral, and also independent of any actions Crown took with respect to the collateral. Paragraph 3 allowed Crown to substitute, exchange or release the collateral without any notice to LaBonte. Paragraph 5 provides that Crown may enforce the guaranty without first resorting to the collateral ". . . provided, however, that nothing herein contained shall prevent the Mortgagee from suing on the Note or foreclosing the Mortgage or from exercising any other rights thereunder. . . ." This provision gave Crown the right to proceed first against either LaBonte or the mortgage debtor in the event of default before the first $45,000 of the debt was paid. The clear language provides that if Crown chose to foreclose *first,* such action would not affect its rights under the guaranty. LaBonte's argument that Crown had to proceed first under the guaranty in order to preserve its right thereunder would read this entire paragraph out of the contract. Rather, paragraphs 3 and 5 provide that LaBonte's liability under the guaranty continues despite any action taken by Crown with respect to the collateral. Therefore LaBonte's liability was not discharged by the sale of the collateral.

Paragraph 5 of the guaranty also requires Crown to apply only the net proceeds of any foreclosure to the

mortgage debt. LaBonte contends that this language requires the application of the proceeds to the guaranteed portion of the debt, thus extinguishing his liability. We disagree. This provision, similar to secs. 846.10(3)[4] and 846.165(2),[5] Stats. 1979–80, relied on by LaBonte,[6] merely requires the application of the proceeds of the sale of the collateral to the mortgage debt. Neither the statutes nor the contract language specify to which part of the single debt the proceeds must be applied, as long as the proceeds are applied against the debt. Both the statutory and contractual requirement were met here by Crown's application of the proceeds to the unguaranteed portion of the single mortgage debt.[7]

---

[4] Sec. 846.10(3), Stats., provides:

"(3) The proceeds of every sale shall be applied to the discharge of the debt adjudged to be due and the costs awarded; and if there shall be any surplus it shall be subject to the order of the court. If any surplus remains in the court for three months, without being applied for, the court shall direct the same to be put out at interest for the benefit of the party entitled thereto to be paid to him under the order of such court."

[5] Sec. 846.165(2), Stats., provides:

"(2) In case the mortgage premises sell for less than the amount due and to become due on the mortgage debt and costs of sale, there shall be no presumption that such premises sold for their fair value and no sale shall be confirmed and judgment for deficiency rendered, until the court is satisfied that the fair value of the premises sold has been credited on the mortgage debt, interest and costs."

[6] The parties in their briefs and during arguments relied on the 1979–80 version of the statutes despite the fact that the contract involved in this appeal was executed in 1971. For that reason all statutory references in this opinion are to the 1979–80 version of the statutes.

[7] LaBonte's reliance on this court's decision in *Sorge Ice Cream & Dairy Co. v. Wahlgren,* 28 Wis. 2d 220, 137 N.W.2d 118 (1965), is similarly misplaced. *Sorge* applied the well-recognized "identical property" rule that in the absence of an agreement to the contrary, if the guaranteed debt is for the acquisition of certain property, the proceeds of this property must be applied to discharge the guaranteed debt rather than *another* unguaranteed debt

Paragraph 9 of the guaranty provides that LaBonte's liability under the guaranty terminates when the principal balance is reduced below $135,000. LaBonte contends that under this provision he was discharged from his obligation when the balance of the note was "reduced" below $135,000 by whatever means, including the application of proceeds of a forced sale. The difficulty with this construction is that he reads the provision in isolation without reference to the remainder of the contract. When paragraph 9 is read in the context of the entire contract, it is clear that the reduction contemplated by the section was reduction by the punctual and voluntary payment by the debtor of the first $45,000 and not by the application of a forced sale payment. Any other construction of this provision would render the language, discussed above in paragraphs 2, 3 and 4, meaningless. It is a cardinal rule of contract construction that the meaning of a particular provision in a contract is to be ascertained with reference to the contract as a whole, *Rosploch v. Alumatic Corp. of America,* 77 Wis. 2d 76, 81, 251 N.W.2d 838 (1977), and the court should avoid a construction that would render any portion meaningless. *Goebel v. First Fed. Savings & Loan Asso.,* 83 Wis. 2d 668, 680, 266 N.W.2d 352 (1978).

This construction of the guaranty, which allows the creditor to apply the proceeds first to the unguaranteed portion of the contract, is consistent with the overall purpose of the guaranty as evidenced by the circumstances surrounding its execution. The guaranty was executed contemporaneously with, and as part of the loan transac-

---

of the guarantor. This rule has no application to the instant case which involves only *ono* debt to which the proceeds were applied. The decision in *University Bank and Trust Co. v. Dunton,* 655 F.2d 23 (1st Cir. 1981), relied on by LaBonte, is distinguishable on similar grounds.

tion, which it guarantees. During the period when the apartment building was under construction, and the risk was greater, the guaranty covered the entire mortgage debt. Because the risk was reduced following construction, the amount guaranteed dropped to the first $45,000 of the mortgage debt. It is clear that the collateral itself was not considered sufficient security for the debt until after construction of the property *and* the payment of the first $45,000.

LaBonte contends that the guaranty was considered as additional security only during the period of construction, and that following the completion of the apartment building the property alone was viewed as sufficient security for the loan. If this contention was correct then there would have been no need for the guaranty to continue in effect following construction of the property. Rather it is apparent from the language of the guaranty in the context of its execution that it was required to provide security in addition to the property, though to a lesser degree following construction. The purpose of the guaranty was to provide security for the payment of the first $45,000, and following such due and punctual payment of this "top" portion of the debt Crown could look to the property itself to secure the remaining balance.

Our construction of the guaranty recognizes its basic purpose—to provide additional security for the debt. If the proceeds from the sale of the collateral were construed to reduce the principal below $135,000 under the terms of the guaranty, the entire contract would be rendered meaningless. Such a construction would achieve the anomalous result that the collateral would benefit the guarantor and not the mortgagee. This court will not construe a contract in such a way that it is rendered meaningless when a more reasonable construction fully comports with the intent of the parties as evidenced by the language of the contracts. Further, the construction is in accord with numerous decisions of courts in other

jurisdictions which have construed almost identical contract language in very similar circumstances. *E.g. Telegraph Sav. & Loan v. Guaranty Bank & Trust,* 67 Ill App 3d 790, 385 N.E.2d 97 (1978) ; *Williams v. Teran, Inc.,* 266 S.C. 55, 221 S.E.2d 526 (1976) ; *MacCulley v. Fidelity Fed. S. & L. Ass'n of Ocala,* 335 So. 2d 327 (Fla. Dist. Ct. App. 1976).

In conclusion, we hold that the application of the proceeds from the forced sale of the collateral to the mortgage debt did not reduce the principal balance below $135,000 pursuant to the terms of the guaranty. Rather the guaranty required due and punctual payment by the debtor of the first $45,000 and thus required voluntary payments under the contract in order to discharge the guarantor's liability. Once default occurred before the first $45,000 of the debt was voluntarily paid, the guarantor became a debtor and liability attached. The sale of the collateral and the application of the proceeds did not extinguish this liability because the entire debt was not satisfied.[8] Any other construction would render the guaranty meaningless and would be contrary to its very purpose. The guarantor should not be relieved of his obligation under the terms of the guaranty by virtue of a forced sale of the collateral that provided security separate from and in addition to the guaranty.

The second issue raised on appeal is whether LaBonte was discharged from his liability under the guaranty due

---

[8] If the proceeds had satisfied the entire outstanding balance of the mortgage debt as in *Muscle Shoals Nat. Bank v. Hallmark,* 399 So. 2d 297 (Ala. 1981), relied on by LaBonte, then liability under the guaranty would have been extinguished despite the failure of the due and punctual performance by the debtor. This is based on the general principles governing guarantees. The guarantor's liability is secondary to the liability of the principal debtor and therefore the satisfaction of the principal obligation discharges the guarantor. *Continental Bank & Trust Co. v. Awka,* 58 Wis. 2d at 388.

to Crown's unjustifiable impairment of the collateral. Because a guarantor who does not sign the negotiable instrument guaranteed is not a "party to the instrument" under sec. 403.606(1)(b), Stats., and at common law such a defense is inapplicable to an absolute guarantee of payment, we hold that LaBonte was not discharged from liability under the guaranty.

LaBonte contends that even if the application of the proceeds did not extinguish his liability under the guaranty, such liability is discharged because Crown unjustifiably impaired the collateral. He relies on sec. 403.606 (1)(b), Stats., which provides:

"403.606  **Impairment of recourse or of collateral.** (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder:
"...
"(b) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

This section is part of Article 3 of the Uniform Commercial Code (UCC) as integrated into the Wisconsin Statutes, dealing with commercial paper. Under this section a party to a negotiable instrument is discharged from liability under that instrument to the extent that the holder unjustifiably impairs the collateral given for the instrument. Therefore in order for LaBonte to claim the benefit of this statutory defense he must be "a party to the instrument" within the meaning of sec. 403.606, Stats.

LaBonte contends that because the guaranty was executed as part of the same transaction as the note, he should be considered a party to the instrument. Sec. 403.-102(1)(e), Stats., defines "instrument" as a negotiable instrument. "Party" is defined in sec. 401.201 as "a person who has engaged in a transaction or made an agree-

ment within chs. 401 to 409." The Official Comments to Sec. 3–606 of the UCC provide:

"1. The words 'any party to the instrument' remove an uncertainty arising under the original section. The suretyship defenses here provided are not limited to parties who are 'secondarily liable,' but are available to any party who is in the position of a surety, having a right of recourse either on the instrument or dehors it, including an accommodation maker or acceptor known to the holder to be so."

The guaranty involved in this appeal is clearly not a negotiable instrument as defined in sec. 403.104, Stats. It was executed by LaBonte in his individual capacity in a contract that was separate and apart from the note. La Bonte, in his individual capacity, did not sign the note which is the only negotiable instrument involved in this action.

Numerous courts in other jurisdictions have analyzed this issue and have held that a guarantor who executes a guaranty separately from the note, although in many instances as part of the same transaction, is not a "party to the instrument" within sec. 3–606 of the UCC. *Kansas State Bank and Trust Co. v. Delorean,* 7 Kan. App. 2d 246, 640 P.2d 343 (1982); *Ishak v. Elgin National Bank,* 48 Ill. App. 3d 614, 363 N.E.2d 159 (1977); *First National Bank of Albuquerque v. Energy Equities Inc.,* 91 N.M. 11, 569 P.2d 421 (Ct. App. 1977); *National Bank of Detroit v. Alford,* 65 Mich. App. 634, 237 N.W.2d 592 (1976). *See also, United States Gypsum Co. v. Sampson,* 496 S.W.2d 687 (Tex. App. 1973); *Fewox v. Tallahassee Bank & Trust Co.,* 249 So. 2d 55 (Fla. App. 1971).

*Ishak v. Elgin National Bank,* 48 Ill. App. 3d 614, 363 N.E.2d 159 (1977), involved a transaction very similar to the instant case. In *Ishak* the defendant signed a promissory note in his capacity as officer of the debtor

corporation, and as part of the same transaction executed a personal guaranty in his individual capacity. The court held that he was not a "party to the instrument" and therefore was not entitled to raise the "suretyship defenses" contained in sec. 3–606 (1) (b) of the UCC, stating:

". . . This court can find no justifiable basis for calling this guaranty a negotiable instrument or even part of a negotiable instrument. The term 'instrument' is expressly defined in section 3–102(1)(e). Clearly, the plaintiff's Exhibit #B in this case (the guaranty agreement) is not a negotiable instrument. (*Associates Discount Corp. v. Elgin Organ Center, Inc.* (7th Cir. 1967), 375 F.2d 97.) It is a separate contract for value entered into by the plaintiff independent of the promissory note.

". . .

"In the case at bar, the plaintiff entered into a separate, unequivocal, continuing guaranty agreement (see *Weger v. Robinson Nash Motor Co.* (1930), 340 Ill. 81, 92) that was independent of the promissory note he executed on behalf of the corporation. The corporation's promissory note listed as the collateral the assets of the corporation. The guaranty insured the corporation's performance on the promissory note, among other undertakings. It was entered into by the plaintiff in his individual capacity, and this 'undertaking of the guarantor was an independent contract' (*Holm v. Jamieson* (1898), 173 Ill. 295, 300), separate from the negotiable instrument.

"Therefore, this court finds that the guaranty entered into by the plaintiff, Ishak, and the Bank was not a negotiable instrument under the Uniform Commercial Code. The guaranty, instead, was a separate, unequivocal, binding contract entered into between the plaintiff and the Bank. . . ." 48 Ill. App. 3d at 616–17.

LaBonte has brought to our attention only one case that has come to the opposite conclusion. *Provident Bank v. Gast,* 57 Ohio St. 2d 102, 386 N.E.2d 1357 (1979). Because we believe the other cases cited above correctly decided the issue, and because a primary purpose of the

UCC is to make uniform the law regulating commercial transactions,[9] we also hold that a guaranty that is executed separate and apart from an instrument is not within the UCC.

In order for a guarantor to be a "party to the instrument," the guarantor must sign the instrument. This is made clear by sec. 403.416, Stats.,[10] which deals with contracts of guaranty that are within the code. "The word 'signature' as used in Section 673.3–416(1) [sec. 403.416(1)] means a signature made upon an instrument. . . ." *Fewox v. Tallahassee Bank & Trust Co.*, 249 So. 2d at 57. Sec. 403.416 clearly requires that the guaranty must be written on the instrument in order to bring it within the UCC. A guarantor who simply guarantees an instrument in a separate contract has not engaged in

[9] *See* sec. 401.102(2)(c), Stats.

[10] Sec. 403.416, Stats., provides:

"403.416 **Contract of guarantor.** (1) 'Payment guaranteed' or equivalent words added to a signature mean that the signer engages that if the instrument is not paid when due he will pay it according to its tenor without resort by the holder to any other party.

"(2) 'Collection guaranteed' or equivalent words added to a signature mean that the signer engages that if the instrument is not paid when due he will pay it according to its tenor, but only after the holder has reduced his claim against the maker or acceptor to judgment and execution has been returned unsatisfied, or after the maker or acceptor has become insolvent or it is otherwise apparent that it is useless to proceed against him.

"(3) Words of guaranty, which do not otherwise specify, guarantee payment.

"(4) No words of guaranty added to the signature of a sole maker or acceptor affect his liability on the instrument. Such words added to the signature of one of 2 or more makers or acceptors create a presumption that the signature is for the accommodation of the others.

"(5) When words of guaranty are used presentment, notice of dishonor and protest are not necessary to charge the user.

"(6) Any guaranty written on the instrument is enforceable notwithstanding any statute of frauds."

a transaction within the UCC and is not entitled to the "suretyship defenses" of sec. 403.606. LaBonte is therefore not discharged from his liability under the guaranty.

This result is also required by the common-law obligations imposed on a guarantor of payment. In *Bank of Sun Prairie v. Opstein*, 86 Wis. 2d 669, 678, 273 N.W.2d 290 (1979), this court stated:

" 'Guarantees of payment "are absolute, not collateral promises. . . . Unlike the contract of an indorser, there is no condition as to demand and notice of default annexed to a contract of guaranty of payment or of performance." ' *Estate of Menzner*, 189 Wis. 340, 341, 207 N.W. 703 (1926). *Nor is it any defense for a guarantor of payment as distinguished from a guarantor of collection that the creditor 'through negligence, or lack of due diligence, lost or dissipated the collateral furnished by the debtor.' United States v. Klebe Tool & Die Co.*, 5 Wis. 2d 392, 397, 92 N.W.2d 868 (1958)." (Emphasis supplied.)

■ The guaranty involved here "unconditionally and absolutely" guaranteed the "due and punctual payment" of the first $45,000 of the debt. It was therefore an absolute guaranty of payment and is not subject to the defense that the creditor impaired the collateral.

The next issue on appeal is whether LaBonte was discharged from liability under the guaranty because Crown exercised bad faith in its dealing with him. LaBonte contends that Crown breached the duty of good faith imposed on it pursuant to sec. 401.203, Stats., which provides:

"401.203 **Obligation of good faith.** Every contract or duty within chs. 401 to 409 imposes an obligation of good faith in its performance or enforcement."

Because, as we have held earlier, this guaranty contract is not within the UCC, this statutory obligation of good faith does not apply.

However, LaBonte is correct in his contention that the common law imposes a duty of good faith on the creditor in his dealings with the guarantor. In *First Nat. Bank & Trust Co. v. Notte,* 97 Wis. 2d 207, 214, 293 N.W.2d 530 (1980), this court stated: ". . . the creditor owes a surety a duty of continuous good faith and fair dealing. . . ." This rule applies equally to the relationship between a creditor and a guarantor. This is simply a recognition of the basic principle of contract law that the obligation of good faith is an implied condition in every contract. *Estate of Chayka,* 47 Wis. 2d 102, 107–08, 176 N.W.2d 561 (1970).

LaBonte contends that Crown exercised bad faith by allowing the mortgage property to deteriorate in value by failing to foreclose on the property at an earlier date and allowing the property to be subject to mismanagement. The trial court, after reviewing the evidence, held that Crown did not exercise bad faith. It found that LaBonte was "at least as culpable as Crown in not protecting his own interest." The court further found that most of the mismanagement of the property was attributable to University National Bank and that before Crown instituted its own foreclosure it was operating under the constraints of the receiver appointed in the bank's foreclosure and its inability to cross-claim for its own foreclosure in the bank's action. These findings by the trier of fact are not against the great weight and clear preponderance of the evidence and will not be disturbed on appeal. *Wurtz v. Fleischman,* 97 Wis. 2d 100, 107, 293 N.W.2d 155 (1980).

LaBonte also challenges the reasonableness of the attorneys' fees awarded and the trial court's dismissal of his third-party claim against the Essers. These issues are remanded to the court of appeals.

*By the Court.*—Judgment affirmed in part and remanded to the court of appeals for determination on the remaining issues.

CECI, J., took no part.

SHIRLEY S. ABRAHAMSON, J. (concurring in part and dissenting in part). I agree with the court's disposition of the four issues decided in the opinion, but I would not remand the remaining two issues to the court of appeals for decision.

All six issues are interrelated and our having decided four issues puts us in a better position than the court of appeals to decide the remaining two issues with minimum delay and maximum efficiency. We are familiar with the parties' arguments and the record in the case and there is no reason why we could not render a decision on the two issues today. Our remand to the court of appeals will delay the decision on these issues for at least 20 days (the time for a motion for reconsideration) and more probably for several weeks or months due to that court's heavy workload. The court of appeals will have to go over material we have already laboriously reviewed, and the losing party on these two issues may seek review in this court, causing additional delay. Remand is a wasteful duplication of decisional effort.

The majority apparently agrees with the court of appeals that the remaining two issues on appeal are not of "statewide concern" which would "result in the development of new law in this state," and therefore in these respects the issues do not meet several of this court's criteria for granting a petition for review. Sec. 809.62 (1), Stats. 1979–80. While I agree with the majority's and the court of appeals' preliminary assessment of the importance of these issues, that assessment is not determinative of the question of remanding these issues.

This case is here on our granting direct review upon certification from the court of appeals. Under our statutes and rules this court takes jurisdiction over an appeal upon certification from the court of appeals. The court of appeals does not certify, and this court does not take jurisdiction over, discrete legal questions within the appeal. *See* secs. 808.05(2), 809.61, Stats. 1979–80; Lefar, *Internal Operating Procedures of Appellate Courts* 76–78 (1976). Although I believe this court has the power to remand these issues to the court of appeals, in the interest of judicial economy, speedy resolution of appeals, reduced costs to the litigants, and finality of decisions, I would have this court decide the entire appeal in this case.