Gwynne D. LAMBERT, Plaintiff-Appellant-Petitioner,

v.

Sally K. WRENSCH, n/k/a Sally Wendt, Elizabeth K. Wrensch, Robert D. Lambert and State Farm Mutual Automobile Insurance Company, Defendants-Respondents.

Supreme Court

*No. 84–793. Argued October 28, 1986.—Decided January 20, 1987.*

(Also reported in 399 N.W.2d 369.)

For the plaintiff-appellant-petitioner there were briefs by *Roger T. Lambert* and *Godfrey & Kahn, S.C.*, Milwaukee, and oral argument by *Mr. Lambert*.

For the defendants-respondents there was a brief by *Gregory J. Cook, Mark D. Koss* and *Kasdorf, Lewis & Swietlik, S.C.*, Milwaukee, and oral argument by *Mr. Cook*.

DAY, J.   This is a review of an unpublished decision of the court of appeals dated August 27, 1985, affirming a Judgment of the Circuit Court of Milwaukee county, Honorable Clarence Parrish, Circuit Judge, awarding damages in a personal injury action arising out of an automobile accident. The issues on review are: 1) Is the insurance policy under which the injured Plaintiff received medical expense payments as a dependent beneficiary an "indemnity" contract such that subrogation exists by operation of law? 2) Is the Plaintiff wife precluded from recovering from the defendant tortfeasor medical expenses paid on her behalf by her husband's insurer when subrogation exists under such policy but such insurer was barred from recovery for failure to pursue its subrogated claim within the period of the statute of limitations? 3) Does a jury award to the husband of the injured Plaintiff wife for loss of consortium, including the element of "material services," preclude the insured Plaintiff homemaker from independently recovering "the reasonable value of her own loss of earn-

ing capacity in the form of domestic services donated by her to her family unit"?[1]

We conclude that the insurance policy at issue in this case constituted an "indemnity" contract, as that term has been defined and employed in previous instances by this court, and therefore subrogation exists by operation of law. This case was properly governed by principles of subrogation and not the "collateral source" rule. We concur with the court of appeals' determination that the trial court did not err in allowing evidence of insurance payments received by Plaintiff to go to the jury, and it did not err in refusing to instruct the jury on the collateral source rule.

The fact that the insurer was barred from recovery for failure to pursue its subrogated claim prior to the expiration of the applicable statute of limitations did not have any substantive effect on the existence of subrogation under the insurance contract. Therefore, the Plaintiff wife is precluded from recovering medical expenses from the defendant tortfeasor which were paid on her behalf by her husband's insurer, despite the fact that the insurer did not and may not pursue its subrogation rights.

We also conclude that the award to Plaintiff's husband for loss of consortium incorporated the damages sought by Plaintiff for loss of earning capacity as a homemaker. We, therefore, agree with the court of appeals that the trial court did not err in refusing to instruct the jury on damages related to Plaintiff's inability to perform housekeeping tasks during her period of recovery from the accident, since such an award would have amounted to a double recovery.

---

[1] The part of this sentence contained in the quotation is as phrased by Plaintiff's counsel on page thirty-four of Plaintiff's brief.

The Plaintiff, Gwynne D. Lambert (Plaintiff), was injured in an automobile accident which occurred May 19, 1978, while a passenger in an automobile driven by her husband, Robert D. Lambert. The Lambert vehicle collided with a vehicle driven by Sally K. Wrensch, and insured by State Farm Mutual Automobile Insurance Company (State Farm). Gwynne Lambert commenced an action against her husband and Sally Wrensch on May 11, 1981. Causal negligence was stipulated between the parties at five percent to Mr. Lambert and ninety-five percent to Ms. Wrensch.

Plaintiff also joined as a defendant the Equitable Life Assurance Society of the United States (Equitable), pursuant to sec. 803.03(2)(a), Stats. (1983-1984).[2] Robert Lambert was an employee of Harnishfeger Corporation, and Equitable was the group health insurance provider for the company. Gwynne Lambert was a dependent under the Equitable policy, and received

---

[2] Section 803.03(2)(a), Stats., provides:

"**803.03 Joinder of persons needed for just and complete adjudication.** ... (2) CLAIMS ARISING BY SUBROGATION, DEPRIVATION AND ASSIGNMENT. (a) Joinder of related claims. A party asserting a claim for affirmative relief shall join as parties to the action all persons who at the commencement of the action have claims based upon subrogation to the rights of the party asserting the principal claim, derivation from the principal claim, or assignment of part of the principal claim. For purposes of this section, a person's right to recover for loss of consortium shall be deemed a derivative right. ...

"Any party asserting a claim based upon subrogation to part of the claim of another, derivation from the rights or claim of another, or assignment of part of the rights or claim of another shall join as a party to the action the person to whose rights the party is subrogated, from whose claim the party derives his or her rights of claim, or by whose assignment the party acquired his or her rights or claim."

insurance payments of $17,887.60 from Equitable to cover medical expenses related to the accident.

Equitable filed an answer, dated December 29, 1981 and subsequently amended it January 8, 1982, in which it asserted its subrogation interest. Plaintiff moved to "dismiss the pleadings" of Equitable, arguing that the applicable statute of limitations barred any claim by Equitable.[3] In a memorandum decision dated May 4, 1982, Judge Patrick T. Sheedy[4] dismissed Equitable's claim, finding that, although Equitable held a subrogation interest, its failure to respond in a timely fashion to the complaint resulted in the running of the statute of limitations.

Prior to trial, Plaintiff brought a motion *in limine*, asking the court to exclude any evidence of insurance payments which Equitable had paid, under its policy, on behalf of the Plaintiff. In a memorandum decision dated May 18, 1983, Judge Sheedy ruled that the Defendants had a right to show that medical expenses had been paid by Equitable.

At the conclusion of trial, Plaintiff requested jury instructions on the "collateral source" rule[5] and such

---

[3] Section 893.54(1), Stats., sets forth the applicable limitations period in personal injury actions. That section provides:

"**893.54 Injury to the person.** The following actions shall be commenced within 3 years or be barred:

"(1) An action to recover damages for injuries to the person."

[4] Judge Sheedy handled this case from its inception until immediately before trial when it was assigned to Judge Clarence Parrish. The first entry on the record signed by Judge Parrish is a set of pretrial orders, dated November 27, 1983.

[5] The "collateral source" rule provides that a personal injury claimant's recovery is not to be reduced by the amount of compensation received from other sources, i.e., sources "collateral" to the

request was refused. The court of appeals upheld the trial court's denial of motions to restrict testimony related to Equitable's payments and the trial court's refusal to instruct the jury on the collateral source rule.

Robert Lambert cross-claimed against his co-defendants for loss of consortium, nursing services provided by him to his wife, current and future medical care for his wife, and for his own personal injuries.

Plaintiff sought damages for the reasonable value of her services as a homemaker. At trial, the court permitted the introduction of opinion testimony from an expert witness, an economist, as to the reasonable value of the services of a homemaker. She claimed that part of her recoverable damages included the fair value of the work and time she would have expended in her capacity as a homemaker in the Lambert household, had she been fully functional in that role during her period of recovery following the accident. Plaintiff requested a jury instruction on her loss of earning capacity as a nonworking homemaker during her recovery period which was refused. Plaintiff contends that such refusal was error.

The court of appeals upheld the trial court's refusal to submit instructions on lost earning capacity of Plaintiff as a homemaker, reasoning that any such damage award would result in a double recovery, since the jury instruction given on Robert Lambert's loss of consortium claim included "the rendering of material services," and this element included the damages sought by Plaintiff.

The jury awarded Plaintiff $2,500 for personal injuries, pain and suffering, and $250 for out-of-pocket med-

---

defendant. *Rixmann v. Somerset Public Schools*, 83 Wis. 2d 571, 577, 266 N.W.2d 326 (1978).

ical expenses. The jury awarded Robert Lambert $1,250 for unreimbursed medical expenses, $3,700 for loss of consortium, and $1,200 for nursing services he provided for his wife.

Plaintiff brought motions after verdict protesting the damage awards by the jury and the trial court's refusal to submit special verdicts incorporating "collateral source rule" and "loss of earning capacity of non-working homemaker" jury instructions. By order dated February 21, 1984, Judge Parrish denied these motions and ordered judgment in accordance with the original jury verdict returned on December 2, 1983.

Plaintiff seeks an additur for her claimed damages not included in the jury award, a remedy whereby the trial court would increase the damages awarded by the jury, to a sum which the court thinks is as a matter of law reasonable; the defendant would then be given the option of accepting the new damage figure or a new trial.[6] Plaintiff asks that if this matter proceeds to a new

---

[6] "A remittitur is the practice of conditioning the denial of a new trial upon the Plaintiff's consent to a decrease in the verdict; an additur is the opposite—The practice of conditioning the denial of a new trial upon the defendant's consent to an increase in the verdict." M. Minzer, J. Nates, C. Kimball, D. Axelrod & R. Goldstein, 1 *Damages in Tort Actions* sec. 1.32[1][b], at 1–36 (1986).

In Wisconsin, trial courts may choose a remittitur or an additur remedy pursuant to sec. 805.15(6), Stats., (1983-1984), which provides:

"**805.15 New trials.** . . . (6) EXCESSIVE OR INADEQUATE VERDICTS. If a trial court determines that a verdict is excessive or inadequate, not due to perversity or prejudice or as a result of error during trial (other than an error as to damages), the court shall determine the amount which as a matter of law is reasonable, and shall order a new trial on the issue of damages, unless within 10 days

trial, that jury instructions be submitted on both the collateral source rule and a homemaker's loss of earning capacity.

## *SUBROGATION AND THE COLLATERAL SOURCE RULE*

Plaintiff argues that Equitable constitutes a "collateral source." Therefore, she should be allowed to recover from the tortfeasor all of her medical expenses, evidence of these payments should not have been admitted, and the jury should have been instructed on the "collateral source" rule.

Plaintiff claims that the Equitable policy contains no subrogation agreement, and that even if the policy can be construed in such a way so as to find subrogation, the party to whom the rights of subrogation belong, Equitable, waived those rights by failing to assert them in time, and therefore no other party may assert subrogation as a "defense." Finally, Plaintiff argues that the defendants lack standing to raise subrogation as a "defense," since defendants (except for Robert Lambert) are not parties to the Equitable insurance contract.

the party to whom the option is offered elects to accept judgment in the changed amount. If the option is not accepted, the time period for petitioning the court of appeals for leave to appeal the order for a new trial under ss. 808.03(2) and 809.50 commences on the last day of the option period."

The Plaintiff in the instant case did not cite sec. 805.15(6), Stats., in either the motion papers on motions brought after verdict or while arguing the motions before the trial court. The nature of Plaintiff's motions after verdict was such, however, that the trial court was effectively asked for an additur remedy under sec. 805.15(6).

Defendants argue that the Equitable policy, by its terms, contains a subrogation agreement. Defendants point out that the trial court found as a matter of fact that Equitable had a subrogated interest in this action. The defendants point to the memorandum decision dated May 4, 1982, in which Judge Sheedy, ruling on Plaintiff's motion to dismiss Equitable's claim, specifically found that the Equitable policy contained a "subrogation provision."

At a subsequent hearing on a motion *in limine,* also brought by Plaintiff, in which Plaintiff sought to exclude evidence of insurance payments by Equitable, Judge Parrish denied the motion, stating that "the court does not find good or sufficient reasons for modifying, setting aside, or in any manner disturbing the order previously entered by Judge Sheedy, and that order stands." Defendants point to the foregoing rulings by the trial court to support their contention that the trial court found as a matter of fact that Equitable had a subrogated interest in this action. Citing sec. 805.17(2), Stats.,[7] defendants argue that the finding that subrogation exists is a finding of fact by the trial court that cannot be set aside unless clearly erroneous. Further, it is pointed out that the time for appeal of this finding has run.

Facts which are stated in a trial court's memorandum decision will be accorded the same weight as if they

---

[7] Section 805.17(2), Stats., provides:

"**805.17 Trial to the court.** . . . (2) EFFECT. In all actions tried upon the facts without a jury . . . the court shall find the ultimate facts and state separately its conclusions of law thereon. . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

had been contained in formal findings. *Hochguertel v. San Felippo*, 78 Wis. 2d 70, 86, 253 N.W.2d 526 (1977). We note, however, that the interpretation of insurance contracts is controlled by the principles of construction applied to contracts in general. *Stanhope v. Brown County*, 90 Wis. 2d 823, 848, 280 N.W.2d 711 (1979). Further, the construction of a written contract is normally a question of law for a court, and it may therefore be reviewed independently on appeal.[8] *Crown Life Ins. Co. v. LaBonte*, 111 Wis. 2d 26, 330 N.W.2d 201 (1983). This court may decide questions of law independently, without deference to decisions of the trial court and the court of appeals. *State v. Nordness*, 128 Wis. 2d 15, 24, 381 N.W.2d 300 (1986).

This court has previously noted that confusion exists as to the operation of subrogation and the collateral source rule in personal injury cases. *Rixmann v. Somerset Public Schools*, 83 Wis. 2d 571, 576, 266 N.W.2d 326 (1978). The workings of subrogation were addressed in *Cunningham v. Metropolitan Life Ins. Co.*, 121 Wis. 2d 437, 360 N.W.2d 33 (1985) wherein this court set forth the analytical framework applicable to situations involving a determination of whether subrogation exists in an insurance agreement.

---

[8] Construction of a written contract is "normally" a question of law because there are instances where the construction becomes a question of fact. Where an ambiguity exists in the contract which requires resort to extrinsic evidence, the question is one of fact and this court will not disturb the trial court's findings unless they are against the great weight and clear preponderance of the evidence. *Jones v. Jenkins*, 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979). Here, as in *Kraemer Bros. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 562, 278 N.W.2d 857 (1979), there was no extrinsic evidence offered bearing upon the meaning of the terms of the policy and thus the meaning of the policy is a question of law.

A handbook furnished to Mr. Lambert regarding the policy in question provides:[9]

> "If you or your dependent incur expenses on account of bodily injury or sickness, caused by the negligence or wrong of a third-party with respect to which benefits are payable in accordance with the provisions of the policy, you may take such benefits under this plan; provided that, if there is a recovery by you or your dependents (or a personal representative) from the third-party or his personal representative, whether by judgment, settlement or otherwise, on account of such bodily injury of sickness, you shall reimburse The Equitable to the extent of the total amount of such benefits paid under this plan, but not in an amount in excess of the proceeds of any such recovery after the deduction of reasonable and necessary expenditures, including attorney's fees, incurred in effecting such recovery."

Plaintiff argues that, historically, accident and health insurance policies have been considered investment contracts under Wisconsin law, and that Equitable's booklet provides for an investment contract. Plaintiff also asserts that the language in the Equitable booklet differs substantially from the standard subrogation language used in the insurance industry.

"Subrogation may exist by operation of law, i.e., equitable subrogation, or may arise by contract of the parties, i.e., conventional subrogation." *Cunningham*, 121 Wis. 2d at 445. If there is no express subrogation in

---

[9] The Equitable policy itself was not introduced into evidence. A handbook or booklet summarizing the policy was introduced into evidence as defendant's exhibit number 8. The quoted provision, taken from the handbook, was read into the record by Robert Lambert during cross-examination of Mr. Lambert at trial.

the contract, the policy must be analyzed to determine whether it is a policy of investment or a policy of indemnity. *Id.* at 446. As explained in *Cunningham*:

> "If the contract is found to be one of indemnity, this court will allow the insurer to receive subrogation, even in the absence of an express subrogation clause. If the contract is found to be one of investment, this court will not permit the insurer to receive subrogation in the absence of an express subrogation clause." *Id.* (Citations omitted.)

In an indemnity contract, the position of an insurer is analogous to that of a surety. *Rixmann*, 83 Wis. 2d at 578, quoting *Patitucci v. Gerhardt*, 206 Wis. 358, 360–361, 240 N.W.2d 385 (1932). In contrast, in an investment contract the owner of the policy is contracting for a particular benefit due upon the occurrence of specified events. *See Rixmann*, 83 Wis. 2d at 578–581. This right is absolute, and independent of the right against any third-party responsible for the injury covered by the policy. *Id.* at 579, quoting *Gatzweiler v. Milwaukee E. R. & L. Co.*, 136 Wis. 34, 39, 116 N.W. 633 (1908).

We conclude that the language cited shows that the insurance policy in question is an indemnity agreement. Equitable expressly contracted to be reimbursed for benefits paid under the policy if Mr. Lambert or his dependents recovered from a third party. This is similar to the policy language construed in *Cunningham*, 121 Wis. 2d at 451.

The next question is whether the fact that Equitable was barred from pursuing its subrogated interest due to the expiration of the statute of limitations gave Plaintiff the right to recover from the defendant

tortfeasor for medical expenses paid on Plaintiff's behalf under the Equitable policy.

Plaintiff argues that even if a subrogation agreement is found to exist, the defendants cannot avail themselves of a subrogation "defense" in that 1) Equitable's inaction effected a "waiver" of subrogation, and 2) Defendants have no standing to assert the existence of subrogation.

The court of appeals noted that the insurer may waive its right to subrogation either by contract or by conduct inconsistent with the right of subrogation, but held that there was no contractual waiver and no overt conduct inconsistent with Equitable's right of subrogation. Both case law and various writers on the subject support the proposition that an insurer may waive its right to subrogation. *See*, 16 *Couch on Insurance*, sec. 61.15 at 89 (M. Rhodes Rev. 2d Ed. 1983); *Leonard v. Bottomley*, 210 Wis. 411, 417, 245 N.W. 852 (1933); *Heifetz v. Johnson*, 61 Wis. 2d at 122. We agree with the court of appeals that Equitable did not, either by contract or conduct, waive its right to subrogation.

A similar situation was presented in *Heifetz*, where an insurer paid out $2,000 in medical expenses to its insured, was not joined as a Plaintiff, and was subsequently dismissed due to the expiration of the statute of limitations. *Heifetz*, 61 Wis. 2d at 115. Since the running of the statute of limitations not only barred recovery, but completely extinguished the party's claim, the insurer no longer had a right of subrogation which would entitle it to be reimbursed by the defendant tortfeasor. *Id.* at 124.

Despite the fact that the insurer no longer had a right to proceed against the tortfeasor, the insured, in proceeding against the tortfeasor, had to recognize the

118

payments received from the insurer. This court stated that:

> "[S]ince the doctrine of subrogation was designed in part to prevent double recovery by the Plaintiff, the Plaintiff should not be allowed to recover the full amount free of the subrogation claim of the insurer which was extinguished by the running of the statute of limitations against the subrogated insurer. This inures to the benefit of the defendant in this case, but that is the public policy expressed in statutes of limitation." *Id.* at 124-125.

We see a similar result required in the present case.

The court of appeals treated the "lack of standing to assert subrogation" argument by noting that the Plaintiff had misconstrued the matter. The court stated that the issue was not "standing" but rather "burden of proof," citing *Rixmann*, 83 Wis. 2d at 582, for the proposition that "one seeking to prove subrogation has the burden of introducing evidence to that effect." The court then concluded that State Farm had met its burden of introducing proof of subrogation.

Plaintiff contends that, under Wisconsin law, a tortfeasor's insurance carrier has no standing to assert entitlement to any benefit of a policy of insurance that it did not issue. Defendants agree with this statement, but urge that the rule is inapplicable to a situation involving the extinguishment of a subrogated claim. Defendants cite *Heifetz* in support of their argument that a defendant may raise any defense to a "subrogated claim which has been extinguished."

We agree with the court of appeals that, in focusing on the issue of "standing," Plaintiff misconstrues the matter. We agree with the court of appeals that the issue is one of burden of proof, and that the relevant language

119

out of which the subrogation agreement arose had been introduced into evidence.

The collateral source rule has not been abandoned in Wisconsin. In *Rixmann,* this court noted that language from the earlier *Heifetz* case may have been taken to mean, under a narrow interpretation, that in any case in which the injured party has been compensated for his loss by his insurer, subrogation in favor of the insurer occurs.[10] *Rixmann,* 83. Wis. 2d at 577. Under such an interpretation the collateral source rule had arguably been eliminated. *Id.*

However, this court made clear that the collateral source rule has survived: *"Heifetz* should not be interpreted as holding that under all circumstances subrogation occurs when an injured party's insurer makes a payment to him and concomitantly, that the collateral source rule has been abandoned." *Id.* at 579. The *Rixmann* decision sheds light on the relationship between the collateral source rule and subrogation. In *Rixmann,* this court discussed *Heifetz,* and specifically the reliance by the *Heifetz* court on *Patitucci.* After examining the facts of the *Patitucci* case, the *Rixmann* court stated that *Patitucci* "was proper authority for the language in *Heifetz insofar as it held that subrogation, occurring under the terms of the policy in question, prohibited the plaintiff from recovering from the defendant that amount which had been paid by the insurer under the collateral source rule." Rixmann,* 83 Wis. 2d at 578–579. (Emphasis added).

---

[10] That language in *Heifetz* appears at 61 Wis. 2d 124:

"Acceptance of payment from an insurer operates as an assignment of the claim to that extent whether or not the policy contains a subrogation agreement. The plaintiff loses his right to sue for any amount received from his insurer." (Footnote omitted).

Also cited in *Rixmann* is *McLaughlin v. Chicago, Milwaukee, St. P. & P. R. Co.*, 31 Wis. 2d 378, 143 N.W.2d 32 (1966), a case involving a plaintiff priest who was permitted to recover the value of his medical treatments even though his order had voluntarily paid them. As summed up by the *Rixmann* court, the result in *McLaughlin* was based on the applicability of one principle of insurance law and the inapplicability of another, "[N]o subrogation occurred and the collateral source rule was held applicable." *Rixmann*, 83 Wis. 2d at 580.

Had the contract in the instant case been an investment contract, no subrogation would exist, and the collateral source rule would apply. *Id.* at 582. However, where subrogation is present, as here, the collateral source rule is inapplicable. We therefore agree with the court of appeals that the trial court properly admitted evidence of Equitable's insurance payments to the Plaintiff and that the trial court properly refused to give jury instructions on the collateral source rule.

## *LOSS OF EARNINGS AS NON-WORKING HOMEMAKER*

Plaintiff argues that she was entitled to have the trial court submit a jury instruction on damages related to her loss of earnings as a homemaker during the period of the time she spent recovering following the accident. Plaintiff urges this court to recognize the individual earning capacity of a homemaker while performing services within the home which are donated by her to her family economic unit.

This court recognizes the role of the homemaker, as a contributor in economic and other ways, to the family unit. However, the question here is whether the type of

damages sought by Plaintiff under the proffered jury instructions had already been taken into account and compensated for by the jury.

At trial, Plaintiff's counsel requested jury instructions on Plaintiff's loss of earning capacity as a homemaker,[11] citing *Carlson v. Drews of Hales Corners, Inc.*, 48 Wis. 2d 408, 180 N.W.2d 546 (1970) in support. The trial court denied the request, concluding that the proffered instructions were "contrary" to *Carlson*. The *Carlson* court held that a jury instruction for damages in a personal injury suit should not be couched in terms of "loss of wages" but should be framed in terms of "loss of earning capacity." *Carlson*, 48 Wis. 2d at 417. However, *Carlson* involved a woman plaintiff that had been employed at various times prior to her injury, and had intended to return to work approximately one month after the date on which she was injured, and the injury prevented her return. *Id.* The plaintiff in Carlson, unlike the plaintiff here, was employed outside the home, and, based on this distinction, the trial court concluded that

---

[11] The Plaintiff submitted three jury instructions related to the loss of earning capacity of a nonworking homemaker. The most relevant of these three proposed instructions, describing the services performed by Plaintiff as homemaker, provided:

"The law recognizes that a woman's ability to care for herself and her children such as sewing, knitting, buying necessities carefully, caring for the household duties economically, and things of that nature, assist her husband in spreading out the small income of the family to meet their needs. That the loss of those services means a loss of money value. If you find that as a result of the injuries sustained by the plaintiff in this action, that she was unable to carry on her normal household duties because of her injuries, you should name such sum as you feel will fairly and reasonably compensate her for the household duties she was unable to perform, not exceeding the amount for which she could have employed other people to do the work."

*Carlson* offered no support for the proposed instructions.

Plaintiff's counsel also argued that the instructions on the homemaker's loss of earning capacity were supported by *Wasicek v. M. Carpenter Baking Co.*, 179 Wis. 274, 191 N.W. 503 (1923), which involved a widow bringing a wrongful death action based on the death of her fireman husband. The trial court similarly rejected plaintiff's argument based on the *Wasicek* case, noting that the case did not turn on the wife's inability to work, but rather the loss of the husband and the contribution the husband made to the family.

The court of appeals noted that the question was not whether an injured homemaker deserves compensation, but how that issue is presented to the jury without inviting a double recovery. The court of appeals pointed out that the trial court, in giving the standard jury instruction on Robert Lambert's loss of consortium claim, employed Wis. J.I. Civil 1815. The trial court instructed the jury:

> "Consortium involves the love and affection, the companionship and society, the privileges of sexual relations, the comfort, aid, advice and solace, *the rendering of material services*.... with respect to material services, the compensation for them is to be measured in terms of what it would reasonably cost on the market for like services." (Emphasis added by court of appeals).

The court of appeals held that, given the fact that part of his loss of consortium jury award included "the rendering of material services," allowing Plaintiff to recover damages for lost earning capacity would result in a double recovery for the same loss. Plaintiff contends that there is no possibility of double recovery since there was

no component of the jury's award related to the husband's loss of consortium which was attributable to Plaintiff's loss of earning capacity.

We agree with the court of appeals that allowing a jury instruction on Plaintiff's lost earning capacity as a homemaker would result in a double recovery and that therefore the trial court properly declined to give such instructions.

The "loss of consortium" instruction given the jury in this case[12] contained a paragraph instructing the jury

---

[12] The jury was given Wis. J.I. Civil 1815, which provides:

"1815 *INJURY TO SPOUSE: LOSS OF CONSORTIUM.* 'Consortium' involves the love and affection, the companionship and society, the privileges of sexual relations, the comfort, aid, advice and solace, *the rendering of material services,* the right of support and any other elements that normally arise in a close, intimate, and harmonious marriage relationship. A wrongful invasion, impairment, or deprivation of any of these rights, resulting from a disabling injury to a spouse, is a legal loss and a basis for damages to the other spouse harmed or deprived.

"In answering this question, you should consider the nature, the form, and quality of the relationship that existed between (the spouses) up to the time of the injury. Based on that relationship, determine what sum will represent fair and reasonable compensation for any loss of consortium that was sustained by the deprived spouse as a result of the injury.

"If you find that the loss will continue in the future, include in your answer damages for the period you are convinced it will continue to exist.

"Compensation for loss of consortium, except as it relates to material services, is not measured by any rule of market value. Instead, it is measured on the basis of what you find is fair and reasonable compensation for the loss sustained by the deprived spouse. *Compensation for material services is to be measured by what it would reasonably cost in the market for like services.*

"So as not to duplicate damages, do not include in your answer any allowance for loss of earnings or loss of earning capacity of the

not to include any award for the loss of earning capacity of the injured spouse. This portion of the instruction, taken alone, implies that the Plaintiff in the present case can recover separately for loss of earning capacity. In some cases, this would be true. However, in this case the "earning capacity" of the injured spouse has a special meaning.

The services rendered by Plaintiff in her capacity as a homemaker were certainly valuable. But the substance of the services and duties which she was unable to perform during her period of recovery, and for which she seeks recovery, overlaps with the types of duties incorporated in the phrase, "material services," as used in the jury instruction on her husband's loss of consortium claim.

The elements of consortium were outlined in the early case of *Selleck v. The City of Janesville,* 104 Wis. 570, 80 N.W. 944 (1899). As stated in *Selleck:* "The wifely services or *consortium* may, and often do, include services such as might be rendered by hired servants; and when that is the case it is usually permitted to prove the customary or market value of such services by testimony of experts familiar with such market value, but it is not necessary that any such physical services should

---

injured spouse. Those damages are dealt with in another question." (Emphasis added).

The record shows that the trial judge, in instructing the jury on the loss of consortium claim, read, in substantial part, the Wis. J.I.— Civil 1815 instruction. Paragraph three, dealing with future losses, was not read; nor was the second sentence of the final paragraph read. However, we note that, in its concluding remarks after the submission of the jury instructions, the trial court stated that instruction 1815 was given to the jury, with instructions not to mask out any part of the 1815 instruction.

customarily be rendered in order to justify some recovery." *Selleck*, 104 Wis. at 577.

The *Selleck* court went on to hold that, under the facts of the case before it, it was not error to instruct the jury that "in placing a value upon the wife's services, they were to understand that word [consortium] as including, not alone such services as a hired domestic servant might perform, but also such as the wife can, *and this wife was accustomed to*, render, if they found those to be disabled by her injuries. . . . " *Id.* at 577–578. (Emphasis added).

In the instant case, Plaintiff sought damages for loss of earning capacity based on her inability to perform services which she was accustomed to performing around the home. *Selleck* makes clear that these services are incorporated in the noninjured spouse's loss of consortium claim.

As noted by this court in *Schwartz v. Milwaukee*, 54 Wis. 2d 286, 292, 195 N.W.2d 480 (1972): "Consortium involves a broad range of elements such as love, companionship, affection, society, sexual relations, and the right of support or the performance of marital services, any one of which is sufficient to constitute a cause of action." Moreover, the right to recover for loss of consortium is no longer a right possessed solely by the husband. *See, Theama v. City of Kenosha*, 117 Wis. 2d 508, 511–513, 344 N.W.2d 513 (1984).

Plaintiff places reliance on *Moran v. Quality Aluminum Casting Co.*, 34 Wis. 2d 542, 150 N.W.2d 137 (1967), arguing that it supports the result Plaintiff seeks here with respect to her damages for loss of earning capacity. The sole issue in *Moran* was whether a wife has a cause of action for loss of the consortium of her husband who has been injured by the negligent acts of a

third person. *Id.* at 545. The *Moran* court concluded that a wife may maintain an action for loss of consortium of her husband against a negligent tortfeasor on the condition that her cause of action is combined with the husband's action. *Id.* at 558.

Plaintiff focuses on the treatment of the "double-recovery" argument in *Moran.* In considering whether to allow the wife's action for consortium, the *Moran* court noted that one argument against allowing such an action was that it would permit a double recovery. *Id.* at 557. It was noted that: "The area where double-recovery might occur is confined to impairment of the husband's earning capacity which would reflect itself in the wife's damages for loss of support." *Id.* at 558.

The *Moran* court concluded that double-recovery could be obviated by requiring that the wife's action be joined with that of her husband for his injuries, and employing a special verdict with accompanying instructions. *Id.* In reaching this conclusion, this court cited *Dini v. Naiditch*, 20 Ill. 2d 406, 427, 170 N.E. 2d 881 (1960), where the Illinois Supreme Court dealt with a similar situation by deducting, from the computation of damages in the wife's consortium action, any compensation given her husband in his action for the impairment of his ability to support. *Id.*

Thus, the *Moran* court allowed the husband to recover for lost earning capacity, while also allowing the wife to bring the consortium claim (minus the loss of support element). Plaintiff states that the instant case is the "opposite of the coin" [sic] from *Moran*, and a similar result should follow: the lost earning capacity claim of the wife should be allowed and the husband's consortium claim should be allowed, minus any element which

may overlap with the wife's recovery on lost earning capacity.

We note that the instant case is not the precise "opposite side of the coin" from *Moran*. One key distinction is that the "lost earning capacity" claims of the husband in *Moran* and the Plaintiff here are different in nature. *Moran*, while it did establish the wife's right to bring a loss of consortium action, did not speak to the issue of the earning capacity of a homemaker not working outside the home.

The *Moran* court relied on a 1960 Illinois decision which treated the double-recovery problem by reducing the wife's consortium claim by the amount received by the husband in his earning capacity claim. *Moran* simply noted that the double-recovery problem could be dealt with by requiring joinder of the claims and employing a special verdict. Thus, the main concern appears to be that courts remain sensitive to the potential for double recovery in these situations.

That the type of services rendered by Plaintiff in her capacity as a homemaker is incorporated by the term "material services" is given further support in *Ballard v. Lumbermens Mut. Casualty Co.*, 33 Wis. 2d 601, 148 N.W.2d 65 (1967). In *Ballard*, the husband was awarded damages on a loss of consortium claim arising out of an accident which caused injuries to the wife. In reviewing the damages awarded on the consortium claim, this court stated the following with respect to the "material services" element that was proven in that case:

> "In addition, the husband was deprived of his wife's services. She is no longer able to do the things around the house that she formerly could do with ease. She can no longer open jars and help her hus-

band with painting, and since the accident Mr. Ballard's mother has helped with the housework 'on and off.' " *Ballard*, 33 Wis. 2d at 612.

The jury award of $3,700 to Robert Lambert for loss of consortium in this case included damages for loss of material services which would have been rendered by the Plaintiff as a homemaker. Any award to the Plaintiff for her loss of earning capacity claim would have constituted a double recovery, and this court has expressed its disapproval of this type of result in other contexts involving damage recovery.[13] *See, e.g., Head & Seamann, Inc. v. Gregg*, 107 Wis. 2d 126-127, 318 N.W.2d 381 (1982); *John Mohr & Sons, Inc. v. Jahnke*, 55 Wis. 2d 402, 412, 198 N.W.2d 363 (1972).

On the basis of the foregoing, we conclude that a new trial on damages is not warranted, nor is additur appropriate. We therefore affirm the decision of the court of appeals.

---

[13] It is clear from the instruction requested by Plaintiff that it was the value of these material services that was being requested. In the jury instructions submitted by Plaintiff, the jury would have been asked to compensate Plaintiff for her inability to carry on her "normal household duties."

We also note that the expert economic testimony introduced by Plaintiff at trial was centered on the value of the services, generally, of a homemaker in the Milwaukee metropolitan area. The economist also gave an opinion on the loss of earning capacity of Plaintiff, as a homemaker, for the period of her recovery from the accident. All of this testimony was strictly concerned with the valuation of homemaker services. There was no claim of loss of capacity to do any other work. Plaintiff's husband recovered damages for loss of these homemaker services in his loss of consortium claim.

*By the Court.*—The decision of the court of appeals is affirmed.