ROSPLOCH, Respondent, v. ALUMATIC CORPORATION OF AMERICA, Appellant.

*No. 75-370. Argued March 1, 1977.—Decided March 29, 1977.*
(Also reported in 251 N. W. 2d 838.)

For the appellant there was a brief by *Peregrine, Marcuvitz, Cameron, Peltin, Hersh & Lensky, S. C.* of Milwaukee, and oral argument by *Sherwin C. Peltin.*

For the respondent there was a brief and oral argument by *Stan L. Lenchek* of Milwaukee.

ABRAHAMSON, J. This is an action by an employee to recover his interest in a profit-sharing plan.

At issue is whether an amendment to such a plan providing for forfeiture in the event the employee. took employment with a competitor could be applied by the employer to divest interests which were vested before the amendment took effect.

The facts are not in dispute.

The Alumatic Corporation of America (hereinafter referred to as Alumatic) is engaged in the manufacture and sale of aluminum combination windows and doors. Eugene Rosploch was an employee of Alumatic (or its predecessors) from September of 1946 until October 25, 1973, when he voluntarily terminated his employment following a dispute with the president of the company concerning a matter unrelated to this case. Approximately one week later he took a job with Consolidated Aluminum Corporation, a New Berlin, Wisconsin, firm also manufacturing and selling aluminum combination windows and doors.

While at Alumatic, Rosploch had been a participant in a profit-sharing plan instituted by the company effective January 1, 1968, for the benefit of all full-time salaried non-union employees. Under the plan, which was qualified by the Internal Revenue Service for tax purposes, Alumatic annually would contribute a portion of its net profits to a trust established for this purpose. The company's payments to the trust were apportioned among participating employees as of December 31st of each year according to a point formula based on annual compensation and years of service. The annual share of each employee was then added to his Company Contribution Account. The plan provided that an employee's interest in his Company Contribution Account vested immediately upon retirement, death or permanent total disability., Otherwise the employee's interest vested according to a specified time schedule, beginning with 10 percent vesting after two years' service with the company or its predecessors, and culminating with com-

plete vesting after eleven years of such service. The rights of a participant upon termination (other than by retirement, death or disability) were stated as follows:

"Except as otherwise provided in the other paragraphs of this Article V, if any employee shall resign or be discharged by the Company prior to reaching age 60 such employee shall be entitled only to the vested equity in his accounts as of the last valuation date preceding the time of such resignation or discharge. 'Vested equity' shall mean the full amount of his interest in his Participant Contribution Account plus the percentage of his interest in his Company Contribution Account which has vested under the terms of [the vesting schedule referred to above]."

The plan also contained a provision entitled "Divesting" which provided that "Notwithstanding anything in this plan to the contrary, the Participant shall forfeit the entire amount credited to his Company Contribution Account" upon the happening of certain specified events. Under the plan as effective January 1, 1968, the events resulting in forfeiture were discharge of the participant by the company for theft, embezzlement, obtaining money or property by false pretenses, insubordination, assisting a competitor without permission, revealing trade secrets of the company, or interfering with the company's relationship with a customer. However, on February 8, 1973, approximately eight months before Rosploch left Alumatic, the plan was amended by adding as an additional ground for forfeiture the following:

"If, during the two years following termination of his employment, the participant shall, without the written consent of Company, enter the employ of, represent, act as a consultant for, or otherwise directly or indirectly perform services for any individual or business organization engaged in activities competitive with those of the Company."

The provision reserving the right to amend the plan provided in pertinent part as follows:

"The Company reserves the right to amend or terminate the Plan at any time; provided, however, that no amendment or termination shall deprive any Participant of his vested equity nor revest in the Company any assets of the Trust . . . ."

Following Rosploch's resignation from Alumatic he made demand upon the company for $3,059.73, the balance in his Company Contribution Account as of December 31, 1972, the last valuation date preceding his departure. Alumatic refused to pay, and Rosploch commenced the instant action on May 20, 1974. Alumatic's only defense was that under the "no competition" amendment to the plan, of which Rosploch was well aware, Rosploch was divested of all interest in his Company Contribution Account as a result of his taking employment with Consolidated Aluminum Corporation. The trial court expressed considerable doubt as to the validity of the amendment, but declined to rest its decision on this basis, holding instead that inasmuch as Rosploch's interest in the plan was fully vested at the time the amendment was adopted, the amendment could not be applied. From a judgment entered accordingly Alumatic has taken this appeal.

## I. VALIDITY OF THE AMENDMENT

Rosploch has not challenged the general validity of the no-competition amendment to Alumatic's plan, either in the trial court or on appeal, and as a result a record regarding this issue was not made. Therefore we, like the trial court, do not rest our decision on this basis. However, it is settled in this state that non-competition forfeiture clauses in pension or profit-sharing plans are

contracts in restraint of trade, and as such, are subject to sec. 103.465, Stats.[1] We share the trial court's view that the validity of the amendment to Alumatic's plan is questionable on this ground.

## II.   APPLICATION OF THE AMENDMENT

Assuming for purposes of decision that the no-competition amendment was valid, we reach the dispositive issue in this case. There was no evidence that would have justified divestment of Rosploch's interest under any of the causes of forfeiture in the plan before it was amended on February 8, 1973. It is also undisputed that Rosploch

---

[1] Sec. 103.465, Stats., provides as follows:

"Restrictive covenants in employment contracts. A covenant by an assistant, servant or agent not to compete with his employer or principal during the term of the employment or agency, or thereafter, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any such restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint."

Non-competition forfeiture clauses in pension or profit-sharing plans are contracts in restraint of trade, subject to sec. 103.465, Stats. *Holsen v. Marshall & Ilsey Bank*, 52 Wis.2d 281, 287, 190 N.W.2d 189 (1971); *Estate of Schroeder*, 53 Wis.2d 59, 68, 69, 191 N.W.2d 860 (1971). The statute is not exhaustive as to the considerations bearing on the validity of covenants not to compete, however. *Behnke v. Hertz Corp.*, 70 Wis.2d 818, 821, 235 N.W.2d 690 (1975). *See generally: Lakeside Oil Co. v. Slutsky*, 8 Wis.2d 157, 161, 162, 98 N.W.2d 415 (1959); Richards, *Drafting and Enforcing Restrictive Covenants Not to Compete*, 55 Marq. L. Rev. 241 (1972); Comment, *Forfeiture of Pension Benefits for Violation of Covenants Not to Compete*, 61 Nw. U.L. Rev. 290 (1966); Note, *Contracts: Restraint of Trade: Forfeiture of Pension Rights on Acceptance of Employment with Competitor*, 50 Corn. L.Q. 673 (1965); Annot. *Validity, Construction & Effect of Provision Forfeiting or Suspending Benefits in Event of Competitive Employment as Part of Retirement or Pension Plan*, 18 A.L.R.3d 1246 (1968).

had been employed by Alumatic or its predecessors for more than eleven years before the profit-sharing plan was instituted; that he therefore acquired a 100 percent vested interest in each annual contribution to his Company Contribution Account at the time the contribution was made; and that as of December 31, 1972, Rosploch had in his account the sum of $3,059.73. But for the amendment in question, when Rosploch resigned in October of 1973, he would have been entitled to payment of that sum, "the vested equity in his accounts as of the last valuation date preceding the time of [his] resignation . . . ," according to one of the alternative modes of payment specified in the plan. The issue is whether the trial court correctly concluded that under the circumstances the amendment could not change this result.

The profit-sharing plan herein was in essence a contract between the employer and the employee. *Holsen v. Marshall & Ilsley Bank,* 52 Wis.2d 281, 284, 190 N.W. 2d 189 (1971). The general rule as to construction of contracts, which applies with equal force here, is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole. *RTE Corp. v. Maryland Casualty Co.,* 74 Wis.2d 614, 620, 247 N.W.2d 171 (1976). This court has applied the rule that profit-sharing plans are to be liberally construed in favor of the employee, and that conditions precedent are not favored in contracts of this nature. *Holsen v. Marshall & Ilsley Bank, supra* at p. 286; *Voigt v. South Side Laundry & Dry Cleaners, Inc.,* 24 Wis.2d 114, 116–118, 128 N.W.2d 411 (1964).[2]

---

[2] In *Evo v. Jomac, Inc.,* 119 N.J. Super. 7, 289 A.2d 551, 557 (1972), it was said with respect to a profit sharing plan:

"[S]ince the plan did not result from a consensual bilateral negotiation but represented a unilateral work product of the employer, any ambiguities in the language should be resolved against the company. [Citations omitted.] And the general dis-

The plan reserves to Alumatic the right to amend the plan at any time, but qualifies this right as follows:

"[N]o amendment . . . shall deprive any Participant of his vested equity . . . ."

The term "vested equity" is defined in the plan to mean:

". . . the full amount of his interest in his Participant Contribution Account plus the percentage of his interest in his Company Contribution Account which has vested under the terms of Article V, sub-paragraph A, 2."

These two provisions plainly state that vested interests are protected from impairment by subsequent amendment. But Alumatic, seizing on a phrase from this court's decision in *Zimmermann v. Brennan*, 56 Wis.2d 623, 202 N.W.2d 923 (1973), argues that it was not the amendment which resulted in the loss of Rosploch's vested equity, but his own act of accepting employment with a competitor, done with knowledge of the nature of the amendment. Though the substance of *Zimmermann* has little relevance to the instant case,[3] Alumatic's contention

---

favor of forfeiture, together with the policy of liberal construction in favor of the employee, further dictates a construction which would avoid such a drastic result."

[3] The *Zimmermann Case* was an action by an employee to remove the trustees of a profit-sharing trust on the ground that a conflict of interest existed because the trustees, who were officers of the employer corporation, were beneficiaries of the trust. The action was instituted when, upon the employee's resignation, the trustees refused to pay the employee's benefits in a lump sum, but instead determined to pay the benefits in annual installments over a period not to exceed ten years. The plan provided that an employee who within one year of his termination took employment in a competitive business in the Milwaukee area would forfeit the unpaid portion of his vested interest. During the course of the litigation it appeared that the employee had violated this provision, and the trustees accordingly informed the employee that his interest had been forfeited. Under the plan the amount of any forfeitures was redistributed among the participants who remained, which included the trustees.

has a certain surface plausibility. It overlooks the nature of the contract here in question, however. The plan constituted an offer of deferred additional compensation, to be paid according to its terms, which Rosploch accepted by continuing to work for Alumatic. *Zwolanek v. Baker,* 150 Wis. 517, 137 N.W. 769 (1912). By virtue

---

The sole issue in the case was whether the trustees had to be removed. This court held that in the case of a profit-sharing trust which contemplated beneficiary-trustees, the conflict of interest resulting from redistribution of forfeitures was not in and of itself grounds for removal of such trustees. Some act of mismanagement or other impropriety was required to be shown. In the course of demonstrating that no such improprieties had been committed by the trustees in that case, the language relied upon by Alumatic here was used (56 Wis.2d at 629, 630):

"In the instant case, the trustees were not found to have committed any act of mismanagement or of making a decision motivated by self-interest. The trustees found Zimmermann was competing with the Studios by working with Barkin-Herman & Associates. Upon this finding *the vested rights of Zimmermann were forfeited, not by the acts of the trustees, but by the acts of Zimmermann under the terms of the trust agreement.* No issue is raised in this case that the finding of the trustees to the effect Zimmermann was competing is incorrect.

". . .

"Indeed it would seem the trustees would have been derelict in their duties to the Studios had they decided to pay Zimmermann his benefits in a lump sum within ninety days when they had reason to know he intended to compete or might compete with the Studios within one year. The profit-sharing plan was to prevent, or at least discourage, as part of its purpose, the employees' voluntary termination of employment and subsequent competition with the Studios at least for one year after such termination. This was one of the benefits the employer received from the plan." (Emphasis added.)

Neither in the trial court nor on appeal did either of the parties in *Zimmermann* raise the issue of the validity of the no-competition clause under Wisconsin law. And, as the trial court in this case stated in its decision, that clause in *Zimmermann* had been part of the profit-sharing plan from the time it was adopted. It was not added by subsequent amendment as occurred in the case at bar.

of the provision for amendment or termination the offer could have been modified or revoked at any time. However, Rosploch had already "accepted" the offer and become contractually entitled to the benefits he here seeks by virtue of his working for Alumatic through December 31, 1972. It is not contended that his performance was less than that called for by the plan as it then existed. His contractual right to benefits was of course subject to divestment upon the happening of the events triggering forfeiture specified in the original plan. However, there is no claim that any of those events have occurred. To the extent of Rosploch's vested equity as of December 31, 1972, a unilateral contract existed as defined by the terms of the unamended plan. The amendment had the effect of adding a new and burdensome condition—a limitation on Rosploch's freedom with respect to future employment—upon Rosploch's right to receive the performance by the Company for which he had contracted.

In *Evo v. Jomac, Inc.*, 119 N.J. Super. 7, 289 A.2d 551 (1972), relied upon by the trial court, an employee sued his former employer for benefits under a profit-sharing plan which had been in force since 1960, but which had been amended in 1966 to provide that notwithstanding any other provision, engagement by a former employee in a competitive activity would result in forfeiture of all benefits under the plan. The employee resigned in 1967 and entered competition with his former employer, who thereafter refused to pay benefits according to the plan. The plan reserved a right of amendment, but provided that "no amendment shall operate to deprive any participant of any rights or benefits thereto having accrued to him under the plan. . . ."

The plan did not provide for vesting until employment was actually terminated, and the company argued that since the amendment was passed before the plaintiff

resigned, it could properly be applied. However, the court held that the power to amend was limited by the instrument itself to preclude deprivation of "accrued" benefits, and interpreted "accrued" to mean "accumulated," which did not require actual vesting. The court held that the amendment could be applied only with respect to benefits accruing after the effective date of the amendment.[4]

In *Rochester Corp. v. Rochester*, 450 F.2d 118 (4th Cir. 1971), the plaintiff employee left the Corporation's employ in 1965 after some twenty-four years' service, and engaged in competitive activities in violation of a clause in the employer's pension plan to the effect that such action authorized the board of directors to declare forfeited "all rights and benefits" under the plan. The plan had been in operation since 1943, but the forfeiture clause was added by amendment in 1960. The plan reserved a right to amend, but provided that no amendment might "impair the interest of any member created by or resulting from prior contributions." Under the plan an employee would be entitled to receive benefits upon reaching age sixty-five if he had been employed for a period of ten or more years, but, as in *Evo v.*

---

[4] The court outlined the general principle it was applying as follows, 289 A.2d, at 554, 555:

"The correlative rights and obligations of the employee and employer under both the pension and profit-sharing plans are governed by ordinary contract principles. These plans do not constitute mere gratuities on the part of the employer to be granted or withdrawn at the whim or largesse of the employer. . . . In effect, the sums payable are no less than deferred compensation for services rendered during the period of employment. As a consequence, 'when the employee renders service in response to the promise of the trust plan, he acquires a right no less contractual than if the plan were expressly bargained for.' "

*See* Annot., *Private Pension Plan: Construction of Provision Authorizing Employer to Terminate or Modify Plan*, 46 A.L.R.3d 464 (1972).

*Jomac,* it appears that rights were not said to become "vested" until the employee either resigned or retired.

The company conceded that it would not have been able to apply the amendment in cases where the employee retired or was terminated before its effective date. However, it argued that as to this employee, its action was proper because the amendment was adopted before he resigned, at a time when his rights were not yet vested. This distinction was rejected, the court holding that the amendment could not be applied to prejudice the employee's rights to benefits accruing prior to the date of its adoption.[5]

---

[5] "We perceive no sound or logical basis for differentiating, as the defendant does, between an employee-member who has served more than ten years but is still employed and one, who has likewise served more than ten years but is not then employed, or for designating the rights of one as 'vested' and the other as 'inchoate.' The result of adopting the defendant's argument would be that an employee serving more than ten years, who had been discharged for cause, would be protected from dilution of his right through an amendment of the plan, but one who had not been so discharged but was still employed, would not be protected. Such a distinction is obviously both unfair and unreasonable. The language of the plan, which, of course, controls, neither suggests nor supports such an inequitable result.

"The pension plan provided that all employees of the defendant, if they remained in the employ of the defendant ten or more years, would be entitled, on attaining retirement age, to certain specified pension rights. While unilateral, that offer, when accepted by an employee as evidenced by rendering services for ten or more years, became 'irrevocable' and such employee acquired 'a right no less contractual than if the plan were expressly bargained for'. By rendering service for the period required under the plan, the employee's rights to benefits under the plan are 'earned no less than the salary paid to him (the employee) each pay period' and are 'in the nature of delayed compensation for former years of faithful service'. Whether the plan be contributory or noncontributory, the benefits, thus earned, are not gratuities." 450 F.2d at 120, 121. (Footnotes omitted.)

Though the precise terminology of the *Evo* and *Rochester* plans differs from that of Alumatic's plan, we are of the opinion that the differences are insignificant and that the result in those cases is appropriate here. Alumatic appears to concede that if Rosploch had quit before the amendment became effective it could not have amended the plan to affect his status. Thus if Rosploch had resigned and gone to work for a competitor in January of 1973 he would have been entitled to receive full benefits. The company claims, however, that since he did not quit until after February 8, 1973, when the amendment was adopted, a different result must follow. This is precisely the differentiation rejected in the *Rochester Case*, and we reject it here.

Alumatic's profit-sharing plan constituted an offer of the benefits stated therein in exchange for service as an employee. In Rosploch's case, by virtue of his lengthy employment with Alumatic and its predecessors, those benefits took the form of a fully vested interest in the share of the company's contributions which was allocated to him on December 31st of each year. His actual receipt of such payments was not guaranteed—payments could be forfeited as a result of his discharge for theft, insubordination or other of the specified causes. The risk of forfeiture on these grounds was part of the contract created by Rosploch's performance. But to hold that Alumatic could impose the no-competition amendment as an additional condition upon Rosploch's contractual right, after he had earned his account by virtue of his performance, is tantamount to saying that benefits under the plan were merely a gratuity. That view of pension and profit-sharing plans has long been inconsistent with Wisconsin law—at least since *Zwolanek v. Baker, supra,* decided in 1912. The limitation incorporated in Article X as to the company's power of amend-

ment, construed as it should be in favor of the employee, is ample evidence of an intent to preclude such a result.

Alumatic suggests that the trial court's decision herein creates problems as to how long an amendment must be in effect before it is controlling, and further suggests that it leads to undesirable discrimination in the treatment of employees who commence work at different times with respect to the time an amendment is adopted. Both of these contentions lack merit. The amendment (assuming it to be valid) became effective immediately as to all participants in the plan, but only with respect to interests in company contributions which became vested after its adoption. If Rosploch had worked through December 31, 1973, and had additional amounts allocated to his Company Contribution Account for the year 1973, and if he had thereafter left Alumatic to work for a competitor, the amendment (if valid) could have been applied to forfeit the December 31, 1973, allocation. All employees are treated by the same standard. It is simply a coincidence that in the case at bar Rosploch acquired no additional vested rights after the amendment was adopted.

*By the Court.*—Judgment affirmed.