In re HARNISCHFEGER
INDUSTRIES, INC.,
et al., Debtors.

Harnischfeger Industries,
Inc. et al., Plaintiffs,

v.

Wisconsin Department of Workforce
Development, Defendant.

Bankruptcy No. 99–2171–(PJW).
Civ.A.No. 01–39–RRM.

United States District Court,
D. Delaware.

Dec. 5, 2001.

Laura Davis Jones, Christopher J. Lhulier, Pachulski, Stang, Ziehl, Young & Jones, P.C., Wilmington, Delaware, Marty R. Howard, David F. Loeffler, Krukowski & Costello, Milwaukee, Wisconsin, James H.M. Sprayregen, Anne Marrs Huber, Kirkland & Ellis, Chicago, Illinois, for debtors.

Allison E. Reardon, Division of Revenue, Department of Finance, State of Delaware, Wilmington, Delaware, Richard Briles Moriarty, Wisconsin Department of Justice, Madison, Wisconsin, for Wisconsin Department of Workforce Development.

Robert J. Dehney, Jason W. Staib, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Lewis Kruger, Wendell H. Adair, Jr., Curtis C. Mechling, Stroock & Stroock & Lavan, LLP, New York City, for Official Committee of Unsecured Creditors of Beloit Corporation.

## OPINION

McKELVIE, District Judge.

This is a bankruptcy case. The debtors are Harnischfeger Industries, Inc. and Beloit Corporation. Harnischfeger is a holding company that owns 80% of the stock of

Beloit. On June 7, 1999, both debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330. The assets of Beloit were eventually divided into separate business units and sold to various buyers during December 1999 and January 2000. Beloit terminated at least 306 non-union employees during and after the sale of its business units. On November 10, 2000, the defendant, the Wisconsin Department of Workforce Development (the "DWD"), filed a proof of claim against each of the debtors for severance benefits allegedly not paid to Beloit's former employees. DWD asserted the claims pursuant to its authority under Chapter 109 of the Wisconsin Statutes to prosecute causes of action for unpaid wages on behalf of Wisconsin employees. The debtors moved to withdraw the reference to the bankruptcy court for the DWD claims and this court granted that motion on February 15, 2001.

DWD's claim against Beloit seeks to recover unpaid severance pay due under a severance policy Beloit established in 1996. It is DWD's position that Beloit violated its contractual obligations under the 1996 policy when it amended the policy in 1999 to facilitate the transfer of its assets to the purchasers. DWD's claim against Harnischfeger proceeds under two theories. First, DWD seeks to recover the same unpaid severance pay from Harnischfeger under the theory that Beloit is Harnischfeger's alter ego and the cases should be substantively consolidated. Second, it seeks damages for Harnischfeger's alleged tortious interference with Beloit's 1996 severance policy.

The debtors moved for summary judgment on DWD's claims on the basis that they are preempted by the Employee Retirement Income and Security Act (ERISA) and not actionable under Wisconsin law. According to the debtors, ERISA preempts the DWD claims because Beloit's severance policy was an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and the prosecution of DWD's claims are thus expressly preempted by § 514(a) of the Act, 29 U.S.C. § 1144(a). Even if DWD's claims are not preempted, the debtors argue that Beloit lawfully amended its 1996 severance policy in 1999 and thus the DWD cannot recover severance pay based on the 1996 policy for employees terminated when it was no longer in effect.

## I. FACTUAL AND PROCEDURAL HISTORY

The court draws the following facts from the affidavits and documents submitted by the parties in support of, and in opposition to, the debtors' motion for summary judgment.

Prior to the debtors' Chapter 11 filing, Harnischfeger was a holding company that owned 80% of the stock of Beloit. Beloit was primarily a pulp and paper machine manufacturer and designer, with employees in Wisconsin and elsewhere. Mitsubishi Heavy Industries Inc. owned the remaining 20% of Beloit's stock.

On December 10, 1996, Beloit issued a severance policy that replaced an earlier policy existing since January 1, 1991. Entitled "Severance Policy," the document stated:

All U.S. non-union employees, who do not have recall rights, will be entitled to the following Severance benefits:

1. Severance pay in the amount of one week's pay for each full year of service, with a minimum of four weeks and a maximum of twenty six weeks.

2. Unused vacation for the current year and any accrued vacation required by law.

3. Continuation of group medical coverage through the end of the month of the severance pay, provided the employee continues the appropriate contribution. This extended coverage will be counted as coverage time under COBRA requirements.

Any exceptions to this policy requires [sic] the approval of the Corporate Vice President of Human Resources.

The severance policy contained no other provisions.

Dennis Winkleman, a former Senior Vice President of Human Resources for Beloit, and Timothy Monahan, a former Director of Human Resources for Beloit, have provided affidavits explaining the workings of the 1996 severance policy. Winkleman's affidavit explains that Beloit's Human Resources Department administered the 1996 severance policy by calculating the years of service and base salary of terminated employees. The years of service provision was calculated in the same manner as it was in the Beloit pension plan. Beloit would then pay the terminated employee the amount required by the severance policy. Winkleman exercised the discretion afforded to him by the policy to make some exceptions for particular employees. On occasion, he decided to give more severance pay than a terminated employee would typically be entitled in return for that employee entering a non-compete agreement or waiving certain statutory employment rights. Large layoffs required Winkleman and other Beloit executives to estimate the amount of severance pay that would be owed to its employees. Monahan's testimony confirmed Winkleman's explanation of the severance policy's workings.

The debtors filed their voluntary petitions for bankruptcy relief under Chapter 11 on June 7, 1999. Following the filing of the petitions, Harnischferger and Beloit operated their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107(a), 1108. In the fall of 1999, John Hanson, Chief Executive Officer of Beloit and Chairman of its Board, and Mark Readinger, President and Chief Operating Officer of Beloit, decided that a sale of Beloit's assets would maximize the value of the companies for their creditors. They divided Beloit into five operating units, including: (1) the Oasis division, (2) the Woodyard division, (3) the Pulping and Finishing division, (4) the Paper Machine Technology division, and (5) the Paper Machine Technology, aftermarket and Rolls division. During December 1999 and January 2000, Beloit entered agreements to sell each of its units to various buyers with the approval of the bankruptcy court.

In his affidavit, Winkleman explained that Beloit's management believed that the company could maximize the value it received in the asset sales by including the employees of each business unit in the sale. To accomplish this purpose, Beloit devised new severance policies to replace the 1996 policy. The debtors received the bankruptcy court's approval to change its severance policy as part of the court's September 30, 1999 Employee Order. According to Winkleman, Beloit attempted to preserve the employment of three groups of employees: (1) employees with experience and skills specific to one of Beloit's units for sale; (2) employees whose continued employment was important to the winding down of Beloit's business; and (3) employees who were working on the installation, maintenance or repair projects for Beloit's customers. According to Winkleman, Beloit would pay twelve weeks of severance pay to employees in the second and third groups, regardless of their length of service with Beloit. The debtors did not submit documentation in support of

Winkleman's description of a twelve week severance payment policy for employees in the second and third of his three groups.

According to Winkleman, Beloit enacted two new severance policies on November 19, 1999. "Severance Policy #2" addressed the first of his groups, employees with experience and skills specific to one the units being sold by Beloit. Severance Policy #2 states the following:

1. This policy, adopted and approved by Beloit Corporation, replaces all existing severance and/or involuntary termination policies dated prior to November 19, 1999. It applies to all U.S.-based, non-union employees who are not covered by Severance Policy #1 (Paper Group) dated November 19, 1999, and who are involuntarily terminated without right of recall for reasons other than misconduct.

2. Severance benefits provided by this policy amendment include the following:

   a) Severance pay in the amount of one week's base salary for each full year of service, with a maximum of 2 week's severance pay and a maximum of twenty-six week's severance pay.

   b) Payment for accrued unused vacation for the current year and any other accrued vacation as required by law;

   c) Continuation of group medical coverage. . . .

3. Notwithstanding any provision of this Severance Policy to the contrary, an employee is not eligible to receive severance pay under Section 2 above if that employee receives an offer of comparable employment (as determined by Beloit Corporation) with a buyer of all or any portion of the Beloit businesses, whether or not the offer is accepted.

4. The severance benefits provided by this policy do not affect the benefits to which an employee may be eligible for under any applicable state or federal law.

At the bottom of Severance Policy #2, a box includes the following reservation, "Beloit reserves the right to amend, modify, or terminate any of its policies or benefit plans at any time, including those described in this document."

The same day, Beloit also issued "Severance Policy #1 (Paper Group)." While Winkleman does not describe which employees are covered by Severance Policy #1 with any particularity, it appears from his affidavit that the employees covered by this policy do not fit into the categories of employees that Beloit wanted to retain. Severance Policy #1 states the following:

1. This policy, adopted and approved by Beloit Corporation, replaces all existing severance and/or involuntary termination policies dated prior to November 19, 1999. It applies to all U.S.-based, non-union employees currently assigned to the Paper Group who are not reassigned to the tissue or aftermarket segments of the rescaled Paper Group (as determined by Beloit Corporation) and who are involuntarily terminated without right of recall for reasons other than misconduct.

2. Severance benefits provided by this policy amendment include the following:

   a) Any pay and benefits to which the employee is entitled under the Worker Adjustment and retraining Notification Act ("WARN"), 29 U.S.C. 2101 to 2109;

   b) Payment for accrued unused vacation for the current year and any

other accrued vacation as required by law; and

c) Continuation of group medical coverage. . . .

Severance Policy # 1 contained the same reservation of right to amend clause as Severance Policy # 2. The primary distinction between the policies, and the impetus for DWD's claim, is that employees covered by Severance Policy # 1 are not entitled to one week's pay for each year of their service to Beloit.

Beginning on February 14, 2000, DWD began receiving complaints from Beloit employees regarding severance and vacation pay. DWD began administrative proceedings on those complaints pursuant to Wis.Stat. § 109.09, which culminated in a Final Determination on September 15, 2000. The Final Determination addressed claims from a number of Beloit employees, including union employees, retired employees, and employees outside Wisconsin. After eliminating the complaints of union employees, non-Wisconsin employees, and various others, the DWD's Final Determination concluded that Beloit was liable to those employees who did not receive compensation under the 1996 severance plan. The Final Determination contained the following conclusion:

> When [Beloit] made the decision to change its severance pay policy on November 19, 1999, it did so unilaterally. Most employees had worked for years under the understanding that if their positions were eliminated, they would at least have the benefit of a generous severance pay plan. This policy was relied upon by these employees when the company decided to file for bankruptcy protection. At that time, they made the difficult decision to stay with a company that had an uncertain future at best. Because employees had provided years of their service in anticipation of this benefit, they had substantially earned the severance pay when the employer decided to change its policy. All employees must receive severance pay under the December 1996 policy, unless the changes made offer a more generous benefit in anticipation of continued faithful service. Because [Beloit] notified employees that were to receive pay under Severance Policy # 1 that they would not be eligible for benefits under the old policy as of November 19, 1999, they earned no further weeks of severance pay after that date. The 306 employees listed on Attachment G are owed severance pay in the gross amount of $4,241,663.90. This is one week of severance pay for each year of service, with a minimum of four weeks, and a maximum of 26 weeks.
>
> . . . .
>
> [Beloit] made the decision to change this benefit policy only because they "saw the writing on the wall," and wished to avoid further liability. Since the benefit was substantially earned, the employer may not alter the policy to the detriment of the employees. An employer may not void a benefit policy when the benefit has already been substantially earned. In this case, the benefit was substantially earned as of November 19, 1999.

The DWD's Final Determination contained no legal authority for its proposition that Beloit employees were entitled to severance benefits under the 1996 severance policy.

On November 10, 2000, DWD filed its two proofs of claim. The proof of claim filed against Beloit sought a recovery of $8,483,327.80, an amount exactly double the amount DWD concluded was due to the former Beloit employees. According

to DWD, Wis.Stat. § 109.11(2)(b)[1] permits it to seek additional wages of up to 100% of the unpaid wages. DWD's claim against Beloit also seeks interest of 5% on its claims pursuant to Wis.Stat. § 138.04 and costs and attorneys fees, as permitted under Wis.Stat. § 109.03(4), though neither are quantified in DWD's claim.

DWD's proof of claim filed against Harnischfeger seeks "at least $10,000,000" in damages. In the supporting documents, DWD explains that its claim is premised on the severance pay allegedly due in the Beloit claim and that DWD seeks recovery from Harnishfeger on that basis under theories of substantive consolidation and alter ego. Alternatively, DWD's claim against Harnischfeger seeks damages for Harnischfeger's tortious interference with the alleged contract between Beloit and its employees created by the 1996 severance pay policy.

Shortly after the two claims were filed by DWD, it filed with the bankruptcy court a motion to allow its claim against Beloit as an administrative expense claim pursuant to 11 U.S.C. § 507(a)(1), (3), and (4) because the claim accrued after the filing of Beloit's petition.

On December 12, 2000, the debtors moved in the district court for withdrawal of the bankruptcy reference for DWD's claims. The court granted the debtors' motion on February 15, 2001 and withdrew the reference from the bankruptcy court. Shortly afterward, on February 23, 2001, DWD served on the debtors its "First Request to Admit Facts and Genuineness of Documents Accompanied by Interrogatories for Requests Not Fully Admitted."

On February 27, 2001, the debtors filed a motion for summary judgment on DWD's claims. The motion for summary judgment presented three arguments. First, that ERISA preempted DWD's claims. Second, that DWD's claims had no basis in Wisconsin law. Three, even if Beloit were held liable for DWD's claims, only a small portion of the claim would be entitled to priority as a post-petition administrative expense. On March 7, 2001, the Official Committee of Unsecured Creditors of Beloit moved to intervene in this action as a plaintiff pursuant to 11 U.S.C. § 1109(b).

DWD responded to the first two arguments by seeking additional time to conduct discovery. The court held teleconferences on March 19 and 27, 2001 at which the parties disputed the need for, and scope of, additional discovery. Among the discovery discussed during the March 17 conference was DWD's outstanding requests to admit. On the debtors' third argument of their summary judgment motion, DWD filed a brief addressing the priority of its claims. The court heard oral argument on the priority of DWD's claims on March 29, 2001 and issued an order on April 17, 2001. That order granted the debtors' summary judgment motion on the priority of DWD's claims, finding that *In re Public Ledger, Inc.,* 161 F.2d 762 (3d Cir.1947), applied to DWD's claims and mandated their trifurcation into three priority classes. Under the court's order, severance pay earned post-petition is allocated administrative priority status under

---

1. Wis.Stat. § 109.11(2)(b) provides:

In a wage claim action that is commenced after the department has completed its investigation under s. 109.09(1) and its attempts to settle and compromise the wage claim under sub. (1), a circuit court may order the employer to pay to the employee, in addition to the amount of wages due and unpaid to an employee and in addition to or in lieu of the criminal penalties specified in sub. (3), increased wages of not more than 100% of the amount of those wages due and unpaid.

11 U.S.C. § 503(b)(1), severance pay earned within 90 days prior to the petition date is allocated third priority status under 11 U.S.C. § 507(a)(3), and severance pay earned before that period is a general unsecured claim.

On April 12, 2001, the debtors served on DWD their response to DWD's requested admissions. On April 18, 2001, DWD filed its answering brief on the debtors' remaining summary judgment arguments. Because the debtors' response to DWD's requested admissions had not been served within thirty days of the request's service, DWD's answering brief proceeded from the assumption that its requests to admit were deemed admitted pursuant to Federal Rule of Civil Procedure 36. On the basis of these deemed admissions, DWD argued not only that the debtors' motion for summary judgment should be denied, but that it was entitled to summary judgment on both grounds. It did not submit, however, formal cross motions for summary judgment.

On April 23, 2001, the debtors filed a motion for a protective order to avoid complying with DWD's request for the production of documents. The debtors' motion also sought that their untimely response to DWD request for admissions be considered timely and that the deemed admissions under Rule 36 be deemed amended.

The court heard oral argument on the remaining summary judgment arguments on April 24, 2001. This is the court's decision on those motions.

## II. DISCUSSION

### A. Summary Judgment Standards

The debtors' motion seeks summary judgment on DWD's claims on the basis that the claims are either preempted by ERISA or lack foundation in Wisconsin law. Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted when "the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56 requires that the debtors, as the moving party, bear the initial burden of informing the court of the basis for its motion and demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has shown an absence of genuine issue of material fact, it is incumbent upon the non-moving party, DWD, to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing Rule 56(e)).

### B. Are DWD's claims preempted by ERISA?

The debtors argue that DWD's claims are preempted by ERISA, 29 U.S.C. § 1001, *et seq.* The debtors' argument is premised on its characterization of the 1996 severance policy as a "employee welfare benefit plan" under ERISA. An employee welfare benefit plan is defined by ERISA as "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other

training programs, or day care centers, scholarship funds, or prepaid legal services...." 29 U.S.C. § 1002(1)(A). The debtors assert that, because the 1996 severance policy is an employee welfare benefit plan under ERISA, claims based on that policy are preempted by the "express preemption" of § 514 of ERISA, 29 U.S.C. § 1144(a).

Section 514 of ERISA preempts "all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." *Id.* (emphasis added). The Supreme Court has described that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). According to the debtors, because DWD's claims are founded upon contract rights due under Beloit's 1996 severance policy, those claims "relate to" an ERISA plan and must be preempted.

DWD asserts that the 1996 severance policy is not an "employee welfare benefit plan," as defined in ERISA, and therefore its claims cannot be preempted. DWD argues that ERISA only governs the administration of "plans," and does not reach all "benefits" an employer might grant to an employee. *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) ("Congress preempted state laws relating to *plans,* rather than simply to *benefits* "). Specifically, DWD maintains that Beloit's 1996 severance policy does not create an ongoing administrative plan and analogizes the case to *Fort Halifax,* in which the Supreme Court held a Maine statute requiring certain employers to pay lump-sum severance benefits to terminated employees was not preempted by ERISA because it did not require "administrative activity potentially subject to employer abuse." *Fort Halifax,* 482 U.S. at 16, 107 S.Ct. 2211.

■ Thus, the court must resolve whether the 1996 severance policy is an "employee welfare benefit plan" and therefore governed (and preempted) by ERISA. "Whether a plan exists within the meaning of ERISA is 'a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person.' " *Deibler v. United Food and Commercial Workers' Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992) (quoting *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1083 (1st Cir.1990)). The test employed by the finder of fact is a simple one. "In summary, a 'plan, fund or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* (quoting *Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir.1982)). In making this analysis, "[t]he crucial factor in determining whether a 'plan' has been established is whether [the employer has expressed an intention] to provide benefits on a regular and long-term basis." *Id.* (quoting *Wickman,* 908 F.2d at 1083).

■ The debtors make two arguments that the 1996 severance policy satisfies the standards for ERISA plans recited in *Deibler.* First, the debtors rely on the affidavits of Winkleman and Monahan to support their argument that the policy is covered by ERISA. Among the facts contained in those affidavits, the debtors note that some form of severance benefit had existed since at least 1991 and the 1996 policy was therefore an ongoing administrative scheme. Furthermore, the debtors rely on Winkleman's assertion that the

severance plan required continuing management to ensure that Beloit could pay the severance benefit when it terminated employees. According to Winkleman and Monahan, employees of Beloit's Human Resources Department managed the severance pay policy by calculating the amount due employees upon termination, based on their salary and years of service, and then paying that amount to employees. Winkleman also exercised his discretion to make exceptions to the severance policy to increase benefits for certain employees who agreed to non-competition agreements or waived state and federal statutory employment rights. The debtors believe these facts demonstrate that the 1996 severance policy was an ongoing administrative scheme for employee benefits and therefore a plan within the scope of ERISA.

Second, the debtors argue that while the 1996 severance policy might lack some of the formalities of more typical ERISA plans, these formalities are not required to make the 1996 policy a plan. Among these formalities, the debtors note that ERISA plans need not be entitled a "plan" because ERISA plans do not need to be written at all. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees,* 974 F.2d 391, 399 n. 4 (3d Cir. 1992). Similarly, the debtors argue that Beloit's failure to comply with ERISA regulations and procedures does not require a finding that its 1996 severance policy was not an ERISA plan. *See Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1503 (9th Cir.1985). Neither does Beloit's failure to set aside funds for the 1996 severance policy prevent it from being an ERISA plan. *See Gilbert v. Burlington Indus., Inc.,* 765 F.2d 320, 325 (2d Cir.1985).

As previously noted, DWD's answering brief proceeds from the assumption that the court will deem its requests to admit as conclusively established because the debtors did not respond to the requests in the thirty days required by Federal Rule of Civil Procedure 36(a). DWD calculates that the thirty days began running on February 23, 2001 and closed on March 26. Because the debtors' response was not served until April 12, 2001, DWD asserts that its requests to admit were deemed admitted.

In the debtors' April 23 motion for a protective order, however, they requested that the deemed admissions be withdrawn and that its untimely response to the requests to admit be considered an amendment to the deemed admissions pursuant to Federal Rule of Civil Procedure 36(b). The debtors repeated their request in the April 24 teleconference. The debtors' motion explained that the expedited deposition schedule and the extensive and lengthy nature of the request to admit necessitated a tardy response. The debtors have also argued that DWD suffered no prejudice by their late response.

The court does not intend to sanction the debtors' delay in responding to DWD's requests for admission. Nonetheless, the court will permit debtors' request to withdraw those admissions pursuant to Rule 36(b) and will resolve this action on the merits. DWD has presented no argument that it will suffer undue prejudice by permitting the debtors to withdraw its deemed admissions. *See* Fed.R.Civ.P. 36(b).

Because DWD's argument on the ERISA issue is premised on the deemed admissions that the court has rejected, its briefing relies on facts that this court has permitted the debtors to amend. Its argument, however, still has some force. DWD argues that the one-time calculation of severance pay benefits is not sufficient to make Beloit's severance policy into a "plan" for purposes of ERISA because

such policy involves no ongoing administration scheme. In doing so, it relies on *Fort Halifax,* in which the Supreme Court found that a Maine statute requiring a lump-sum payment of severance pay according to a certain formula was not an ERISA plan, and *Angst v. Mack Trucks, Inc.,* in which the Third Circuit found a one-time cash buyout of union employees was not an ERISA plan. *Fort Halifax,* 482 U.S. at 18–19, 107 S.Ct. 2211; *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530, 1538 (3d Cir.1992).

Given the incomplete nature of the briefing in this case, the court is not prepared to resolve whether the 1996 severance policy is an employee welfare benefit plan within the scope of ERISA. While the affidavits of Monahan and Winkleman establish the mechanism by which Beloit disbursed severance benefits, it is unclear to what extent the disbursal of such benefits required Beloit to create an ongoing administrative scheme. For example, it remains unclear whether the severance pay was disbursed as a lump sum or whether it was paid over time. Similarly, the bare record presented by the parties does not illustrate whether Beloit merely performed the simple arithmetic required by the plan and paid the amount from its cash, or whether Beloit undertook individualized inquires for each employee. Nor does the record reveal how many employees had their severance benefits enhanced and by what standards Beloit made that determinations. As the record currently stands, the debtors have not shown an absence of a genuine issue of material fact because a reasonable jury could return a verdict for DWD. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Thus, the court will deny the debtors' motion for partial summary judgment on the issue of preemption without prejudice to renewal of the debtors' motion on a more complete record.

**C.** *Did Beloit breach a contract with its employees by not fulfilling the terms of the 1996 severance policy for employees terminated after the replacement of that policy?*

DWD's claims seek to recover lost wages due the former employees under Beloit's 1996 severance policy. Chapter 109 of the Wisconsin Statutes empowers DWD to investigate wage claims submitted by employees and, if necessary, "sue the employer on behalf of the employee to collect any wage claim or wage deficiency." Wis.Stat. § 109.09(1). The chapter defines "wages" as:

> remuneration payable to an employee for personal services, including salaries, commissions, holiday and vacation pay, overtime pay, *severance pay* or dismissal pay, supplemental unemployment benefit plan payments when required under a binding collective bargaining agreement, bonuses and any other similar advantages agreed upon between the employer and the employee or provided by the employer to the employees as an established policy.

Wis.Stat. § 109.01(3) (emphasis added). Thus, Wisconsin law provides that DWD can sue to recover not only unpaid severance pay, but any other form of compensation provided by the employer or agreed by the employer and employee.

Even if Chapter 109 did not define wages so expansively, Wisconsin case law has recognized that employment policies can create contractual obligations from employers to employees. "Personnel policies, offering stated benefits in exchange for the employee's service, are binding contracts upon the substantial performance of the requested services." *Demerath v. Nestle Co.,* 121 Wis.2d 194, 358 N.W.2d 541, 543 (Ct.App.1984) (citing *Compton v. Shopko Stores, Inc.,* 93 Wis.2d

613, 287 N.W.2d 720, 725 (1980)). Thus, DWD is asserting that the 1996 severance policy constituted an enforceable contract, allegedly breached by the debtors.[2]

■ In *Compton v. Shopko Stores, Inc.*, 287 N.W.2d at 725, the Wisconsin Supreme Court adopted the following definition of severance pay from *Republic Steel Corp. v. Maddox*, 275 Ala. 685, 158 So.2d 492, 494 (1963), *rev'd on other grounds*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965):

> Severance pay, by its very definition, means compensation due an employee, upon the severance of his employment status with the employer. He must accept his discharge as final before any claim for severance pay can be made. A payment of severance pay by the employer and the acceptance of the same by the employee would, in our opinion, be the complete manifestation of the termination of the employment relationship. A claim for severance pay could never arise during the employment relationship of the parties . . .

*Id.* While Wisconsin courts have applied this description of severance pay generally, they have nevertheless affirmed that the terms of the particular severance pay contract govern its application in any particular factual context. *Demerath*, 358 N.W.2d at 544.

The debtors argue in their summary judgment motions that its former employees are not entitled to severance pay under the 1996 policy because that policy was replaced by the 1999 policies and the substitution did not violate Wisconsin law. Their argument is twofold. First, the debtors argue that none of its former employees had a right to severance wages at the time Beloit changed its severance plan.

According to the debtors, an employee's entitlement to severance wages was conditioned on his termination without the fault. As such, severance wages were a "conditional entitlement" to which none of the later-terminated employees were entitled until after the 1999 policy change. Because none of the former employees were terminated until after the December 1999 change, none of the employees have rights under the 1996 plan.

Second, the debtors argue that it acted within the bounds of Wisconsin law when it replaced the 1996 policy. Of course, the debtors cannot rely on a provision of the 1996 severance policy addressing amendment of that policy. While the 1999 severance policies contained language reserving Beloit's right to "amend, modify, or terminate any of its policies or benefits plans at any time," the 1996 severance policy contains no similar reservation. Lacking specific authority in the 1996 policy to justify the cancellation and replacement of that policy, the debtors argue that it had the right to cancel the policy without such a provision under a "default rule" of Wisconsin law.

The debtors' default rule is that employment benefit entitlements do not extend in perpetuity under Wisconsin law. As authority for this rule, the debtors cite *Forrer v. Sears, Roebuck & Co.*, 36 Wis.2d 388, 153 N.W.2d 587 (1967). In *Forrer*, the plaintiff had been terminated from employment with Sears despite Sears's earlier promise to him of "permanent employment." 153 N.W.2d at 589. The plaintiff's suit was founded on promissory estoppel and alleged that the plaintiff had relied on the offer of permanent employment to his detriment. The Wisconsin Supreme Court held that there could be no promissory

---

**2.** Neither of the debtors challenge DWD's assumption that the 1996 severance policy constitutes a contract.

estoppel claim on these facts because "a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party." *Id.* According to the debtors, because *Forrer* established that contracts for permanent employment were unenforceable, all contracts for permanent employment benefits were similarly unenforceable.

DWD responds that Wisconsin law contains no such default rule. Rather, DWD asserts that Wisconsin law does not permit employers to "unilaterally amend contracts to eliminate or alter employees' vested rights in employee benefits, even if, unlike here, the employees purportedly reserved the right to amend or terminate those benefits." *See Schlosser v. Allis–Chalmers Corp.*, 86 Wis.2d 226, 271 N.W.2d 879, 888 (1978). Because Wisconsin law does not permit such amendments, DWD contends that Beloit's substitution of the 1999 severance policy for the 1996 policy was without legal effect. Thus, "[t]he 1996 policy was a binding contract because the employees completed the required service to earn the severance pay."

■ DWD's recitation of Wisconsin law is correct. Wisconsin employers may not unilaterally change the terms of an employments benefit when those benefits have vested. *Schlosser*, 86 Wis.2d at 247, 271 N.W.2d 879; *Rosploch v. Alumatic Corp. of Am.*, 77 Wis.2d 76, 251 N.W.2d 838, 844 (1977). In fact, Wisconsin employers may not avoid this result even by reserving the rights to amend its policies. *Schlosser*, 86 Wis.2d at 247, 271 N.W.2d 879. "To permit such a power of amendment to be exercised by an employer to effect a unilateral change in a retirement plan as to employees who have fully performed their services and whose rights under the plan thus became vested would truly be to render the plan a mere gratuity." *Id.* This precedent is distinguishable, however, from the facts of this case as alleged by the debtors. According to the debtors, the rights of Beloit employees had not yet vested when the 1999 severance pay policy was substituted for the 1996 policy. The debtors interpret the 1996 policy as vesting the right to severance pay "if and only if the employee is terminated without cause."

Thus, this court must resolve whether the 1996 severance pay policy contains the vesting requirement alleged by the debtors. *See Demerath*, 358 N.W.2d at 544 (in evaluating severance pay policies, "contractual terms control"). The debtors do not rely, however, on the 1996 severance policy to support this alleged vesting requirement. Instead, it points to the 1996 policy's predecessor—the 1991 severance policy. Under the 1991 policy, "termination pay" is only permitted for "an employee who is involuntarily terminated for reasons other than misconduct, retirement, or death." The debtors' position is that this requirement carried forward to the 1996 severance policy. The court disagrees. Nothing in the 1996 severance policy incorporates or repudiates the earlier policies and thus it cannot be said that the 1996 severance policy unambiguously requires termination without fault as a prerequisite to receiving severance pay.

■ It is clear, however, that the 1996 severance policy is titled "Severance Policy." Under Wisconsin law, the plain meaning of "severance pay" is "compensation due an employee, upon the severance of his employment status with the employer." *Compton*, 287 N.W.2d at 725 (quoting *Republic Steel Corp.*, 158 So.2d at 494). Thus, regardless of the circumstances of a particular employee's termination, it is

clear that, at the very least, the 1996 severance policy requires the termination of an employment before an employee has a right to severance pay.

Moreover, Wisconsin law contains a presumption in favor of finding vesting requirements in employee benefits contracts. *Roth v. City of Glendale*, 237 Wis.2d 173, 614 N.W.2d 467 (2000). In *Roth v. City of Glendale*, the Wisconsin Supreme Court considered a series of collective bargaining agreement for union employees [3] that contained different health benefits for the union's retirees. Over the years, the employer and union had altered the health benefits provisions of the collective bargaining agreements to the detriment of the union's retirees, who sued the employer to recover the benefits as provided in the agreement in effect at the time of their retirement. *Id.* at 469. The court relied on *Schlosser*, 271 N.W.2d at 889, for the proposition that employers may not alter the terms of employment benefits plans after the employees have completed the service necessary to attain those benefits. *Roth*, 614 N.W.2d at 472–73. It went on to adopt the general presumption, suggested in the concurring opinion of Judge Cudahy of the Seventh Circuit in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 611 (7th Cir.1993) (Cudahy, J., concurring), "that benefits vest unless there is evidence of an agreement to the contrary." *Roth*, 614 N.W.2d at 472. Applying this general presumption to the collective bargaining agreements, the court concluded that retirees were entitled to the benefits provided by the collective bargaining agreement in force at the time of their retirement. *Id.* at 472. Thus, the Wisconsin Supreme Court has adopted a presumption that benefits attained by retiring vest at that time even in the absence of explicit language setting forth that vesting. Applied to this case, *Roth* supports the conclusion that the 1996 severance policy vests the right to benefits upon the termination of the employee and that those benefits cannot be altered following that vesting. In light of the language of 1996 severance policy and the general presumption set forth in *Roth*, the court finds that the 1996 policy created a vested right to severance pay at the time employees were terminated.

■ Yet the conclusion that the rights of Beloit's former employees to severance pay had not vested at the time Beloit changed its severance policy does not answer the question of whether Wisconsin law permits employers to unilaterally change its benefits policies for non-vested employees. No party has suggested precedent on this question. In the absence of governing state law, federal courts must predict how the state's highest court would decide the issue. *Koppers Co. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir.1996) ("In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply existing state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us.").

■ Wisconsin courts have found that amendments to employee benefit plans do not alter the rights of employees whose rights under those plans have vested. *See Schlosser*, 271 N.W.2d at 889; *Rosploch*, 251 N.W.2d at 844. For example, in *Rosploch* the court stated that permitting amendment of a profit-sharing plan after

---

**3.** While *Roth* addressed the rights of union employees under collective bargaining agreements, the court suggested that the interpretation of collective bargaining agreements was no different than the interpretation of "other contracts." *Roth*, 614 N.W.2d at 471.

an employee's rights had vested would render that benefit a gratuity. "[T]o hold that [the employer] could impose the . . . amendment as an additional contractual condition upon [the employee's] contractual right, after [the employee] had earned his [benefit] by virtue of his performance, is tantamount to saying that benefits under the plan were merely a gratuity." *Rosploch*, 251 N.W.2d at 844. Similarly, in *Schlosser*, the court held that amendment of a company-paid life insurance plan for retirees after the employees had created a vested interest in that life insurance by retiring would "render the plan a mere gratuity." *Schlosser*, 271 N.W.2d at 889. In each case, the courts focused on the fact that the employee has earned his benefits by performing whatever was required to create a vested right. *Schlosser*, 271 N.W.2d at 889; *Rosploch*, 251 N.W.2d at 844. Were there a general rule that, regardless of whether right had vested or not, employers may not unilaterally alter the terms of its employment benefits, those Wisconsin courts would simply have relied on that rule. Instead, they relied in each case on the completed performance of the vesting conditions. *Schlosser*, 271 N.W.2d at 889; *Rosploch*, 251 N.W.2d at 844. Thus, it can be inferred that Wisconsin law does not prohibit employers from altering its employment plans with respect to benefits that have not vested.

■ This result is consistent with the understanding that, under Wisconsin law, employee benefits policies are unilateral contracts, in which the employer makes an offer and employees accept that offer by completing the required performance, not by making a complementary promise of acceptance. In *Zwolanek v. Baker Mfg.*

*Co.*, 150 Wis. 517, 137 N.W. 769 (1912), the Supreme Court of Wisconsin described an employee profit-sharing plan as a unilateral or "reward" contract. In such contracts, "[p]erformance constitutes acceptance of the offer, *and after performance* it cannot be revoked, so as to deprive a person who has acted on the faith thereof of compensation." *Id.* at 772 (emphasis added). Thus, the employment benefit policy is not itself a contract, but only an offer until the performance of the employee is completed. "Until acceptance by performance of the services, it is merely a proposition; but when accepted by performance it becomes a binding contract, subject to the laws governing contracts generally." *Id.* The cases that have followed *Zwolanek*, including those relied upon by DWD, have all adopted this same description of employee benefits as unilateral contracts. *See Compton*, 287 N.W.2d at 726 (executive bonus plan requiring continued employment was a "unilateral contract"); *Schlosser*, 271 N.W.2d at 884 (describing a retirement policy as a "unilateral requirement [which] requires that the offeree perform the requested act with the intent of accepting the offer"); *Rosploch*, 251 N.W.2d at 842 (describing the nature of a profit-sharing plan as "a unilateral contract"). Because a completed unilateral contract is not created until the offeree has substantially completed the performance required by the offer, there can be no claim for breach of contract before that time. *Zwolanek*, 137 N.W. at 772.

The court thus agrees with the debtors that Beloit could amend the severance pay benefits it conferred on its at-will employees prior to the termination of those employees.[4] Thus, the DWD cannot maintain

---

4. The harshness of this result is mitigated, under Wisconsin law, by the existence of promissory estoppel. When there is no contractual obligation between the parties, none-

theless an employer's promise to an employee may enforced when the following three questions are answered in the affirmative: "(1) Was the promise one which the promisor

a breach of contract claim against the debtors for employee benefits allegedly due under Beloit's 1996 severance pay policy.

## III. *CONCLUSION*

For the foregoing reasons, the court finds that it lacks sufficient evidence on the record before it to determine whether the 1996 severance policy is an employee welfare benefit plan. Thus, the debtors are not entitled to summary judgment on the basis that DWD's state law claims are preempted. However, because Wisconsin law does not provide for a breach of contract claim for the payment of severance benefits when those benefits have not yet vested, DWD cannot bring a contract claim for benefits unpaid under the 1996 severance policy. Because DWD's claim against Beloit is premised solely on its breach of contract claim for severance pay, the motion for summary judgment with respect to that claim is granted. Similarly, DWD's claim against Harnischfeger is premised, in part, on the 1996 severance policy's creation of a contract. Insofar as DWD's Harnischfeger claim seeks damages for breach of the 1996 severance policy, the court will grant the debtors' motion for summary judgment. Because the parties have not briefed whether this disposition also terminates the alternative theory presented in the DWD claim—tortious interference with contract—the court will not address the viability of this theory.

should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee? (2) Did the promise induce such action or forbearance? (3) Can injustice be avoided only by enforcement of the promise?" *See Mackenzie v. Miller Brewing Co.,* 241 Wis.2d 700, 623 N.W.2d 739, 748 (2001). DWD has not asserted its claims under a promissory estoppel theory and thus this court will not address whether such a claim would afford the DWD relief under the current facts.